J-A28020-19

2021 PA Super 18

| DAVID H. MARION, RECEIVER FOR BENTLEY FINANCIAL SERVICES, INC. AND ENTRUST GROUP | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| BRYN MAWR TRUST COMPANY | |
| Appellee | No. 2470 EDA 2018 |

Appeal from the Judgment Entered July 26, 2018
In the Court of Common Pleas of Montgomery County
Civil Division at No: 2003-19232

BEFORE:  PANELLA, P.J., STABILE, J., and COLINS, J.*

OPINION BY STABILE, J.:                    **FILED:  FEBRUARY 16, 2021**

Appellant, David H. Marion, receiver for Bentley Financial Services, Inc.

and Entrust Group, appeals from the July 26, 2018 judgment entered in favor

of Appellee, Bryn Mawr Trust Company ("BMT").  We vacate and remand for

a new trial.

On October 23, 2001, the Securities and Exchange Commission

commenced an action against Robert Bentley for an alleged Ponzi scheme.

The Federal District Court for the Eastern District of Pennsylvania ("District

Court") appointed Appellant receiver on November 1, 2001.  The District Court

also froze the assets of Bentley and two entities he controlled, Bentley

_____

* Retired Senior Judge assigned to the Superior Court.

Financial Services ("BFS") and Entrust Group ("Entrust"). The scheme arose in 1996 shortly after Main Line Bank ("Main Line") discovered that Bentley forged his accountant's signature on a document. Main Line promptly demanded repayment of a fully drawn $2 million line of credit within thirty days. To satisfy Main Line, Bentley sold $2 million dollars of fictitious certificates of deposit ("CDs").

Thereafter, Bentley continued to sell fictitious CDs to new investors in order to pay off previous investors. He also hired a new accountant, Sanford Goldfein. In October of 1997, Goldfein referred Bentley to BMT for his banking needs. Goldfein had referred business to William Fink, BMT's vice president for commercial lending, on several prior occasions. Initially, Bentley sought a $2 million line of credit, checking accounts, and wire transfer accounts. BMT conditionally approved the line of credit pending, among other things, a favorable credit reference from Main Line. Proof of collateral apparently was not one of the conditions. Regardless, Bentley withdrew his application for the line of credit before BMT contacted Main Line. He opened various deposit and wire transfer accounts with BMT and quickly became one of BMT's largest customers.

According to Appellant's amended complaint, Bentley and his companies went on to sell more than $4 billion in private, unregistered notes, falsely leading investors to believe they were buying FDIC-insured CDs. Amended Complaint, 8/1/12, at ¶¶ 2, 13. Bentley eventually pled guilty to mail fraud

and was sentenced to serve 55 months in federal prison and pay $38 million in restitution. The instant action concerns Bentley's use of his BMT accounts to deposit and transfer investor funds in furtherance of his fraudulent scheme.

Appellant, as receiver, claims BMT knew of or, at the very least, deliberately ignored obvious evidence of Bentley's unlawful activity. Appellant claims BMT turned a blind eye in order to accommodate a very profitable customer. BMT denies any awareness of Bentley's scheme and claims Bentley's victims could have been compensated in full but for Appellant's errant actions as receiver. In particular, BMT claims Appellant's expensive litigation strategy and his decision to redeem some CDs prior to their maturity more than offset the damages Appellant sought to recover in this case. Appellant counters that the trial court erred in admitting evidence of Appellant's counsel fee expenditures and in permitting the jury to consider the merit of Appellant's early redemption of CDs. Appellant notes the SEC and many of the victims urged early redemption of CDs and all of his decisions and fee expenditures as receiver, were approved by the District Court.

Appellant filed a complaint against BMT on May 21, 2004, alleging breach of common law fiduciary duty, breach of the Uniform Fiduciaries Act ("UFA"), 7 P.S. § 6351, *et. seq.*, aiding and abetting fraud, and negligence. With leave of court, Appellant filed an amended complaint more than eight years later, on August 1, 2012. The amended complaint alleged the same causes of action. On January 24, 2014, the trial court granted BMT's summary

judgment motion on aiding and abetting fraud, but denied the motion as to Appellant's remaining claims. The trial court concluded Pennsylvania does not recognize an action for aiding and abetting fraud.

The parties chose a jury on March 9, 2018. At the close of his evidence, Appellant withdrew his claim for breach of common law fiduciary duty. On March 16, 2018, the jury returned a defense verdict on Appellant's UFA and negligence claims. Appellant filed post-trial motions seeking a new trial that was denied by the trial court on July 26, 2018. Judgment was entered on the verdict that same day. This timely appeal followed. Appellant filed a timely 1925(b) statement on August 27, 2018, to which the trial court issued an opinion on July 2, 2019. Appellant raises the following issues for our review.

> (1) Did the trial court err in holding that Pennsylvania law does not recognize a claim for "aiding and abetting fraud," when this Court has expressly recognized such a tort claim consistent with the Restatement (Second) of Torts as synonymous with the established claim for "concerted tortious conduct"?
>
> (2) Is the Receiver entitled to a new trial because the trial court improperly and repeatedly allowed the Defendant to introduce prejudicial evidence of:
>
> (a) the Receiver's estimated attorneys' fees and expenses over the entire life of the receivership, including this litigation and many other matters, when the Receiver's attorneys' fees and expenses (1) were completely irrelevant to any issue in this case; (2) had been approved by the federal court having jurisdiction over and supervising the Receivership; and (3) in attempting to cure his prior errors, the trial court gave a confusing and misleading jury instruction on the subject?
>
> (b) the Receiver's decision to liquidate Certificates of Deposit ("CDs") prior to their maturity, when that decision was also (1) irrelevant to the issues in this case; (2) was directed and approved by

- 4 -

the supervising federal court; and (3) in attempting to cure his prior errors, the trial court gave a confusing and misleading jury instruction on the subject ?

Appellant's Brief at 4-5.

## A.   Aiding and Abetting Fraud.

Appellant's first argument—that the trial court erred in granting summary judgment on his aiding and abetting fraud cause of action—presents a question of law.  Our standard of review is *de novo* and our scope of review is plenary.  ***Eclipse Liquidity, Inc. v. Geden Holding, Ltd.***, 200 A.3d 507, 509-10 (Pa. Super. 2018).  Summary judgment is appropriate where there is no genuine issue of material fact as to a necessary element of a cause of action that can be established by discovery or expert report.  Pa.R.C.P. No. 1035.2(1).  "In reviewing an order granting a motion for summary judgment, an appellate court must examine the entire record in the light most favorable to the non-moving party and resolve all doubts against the moving party." ***Donegal Mut. Ins. Co. v. Fackler***, 835 A.2d 712, 715 (Pa. Super. 2003). Instantly, the trial court granted summary judgment on Appellant's aiding and abetting fraud claim because it believed no such cause of action exists in Pennsylvania.

We begin with a review of Appellant's allegations.  In the amended complaint, Appellant alleged that BMT failed to follow its own industry-standard Know Your Customer ("KYC") policy, and that the account activities of Entrust were not consistent with that of a custodian of CDs, which Bentley

claimed Entrust was. Amended Complaint, 8/1/12, at ¶¶ 19-32. Likewise, Appellant alleged that BFS, a purported broker of securities and CDs, would have required a line of credit for BFS to operate its business. *Id.* at ¶¶ 35-36. Bentley chose not to pursue a line of credit from BMT, and BMT never inquired whether or from where BFS maintained a line of credit anywhere else. *Id.* Appellant alleged that Bentley was, in effect, using the Entrust account as a revolving line of credit for BFS, and that this should have been obvious to BMT. *Id.* at ¶ 37. Appellant alleged that BMT prioritized collecting fees from Bentley and hoped Bentley would bring BMT more business. *Id.* Appellant also alleged that BMT should have asked Main Line about Bentley. *Id.* at ¶¶ 38-40.

In opposing BMT's motion for summary judgment, Appellant argued that BMT's conduct was actionable under § 876 of the Restatement (Second) of Torts:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979).[1]

First, we consider whether Pennsylvania recognizes a cause of action for aiding and abetting fraud. In **Skipworth v. Lead Indus. Ass'n, Inc.**, 690 A.2d 169 (Pa. 1997), the plaintiff alleged a personal injury action against manufacturers of lead-based paint. The Supreme Court rejected the plaintiff's market share theory of liability, whereby the known manufacturers of lead-based paint would have been liable to the plaintiff in proportion to their market share even though the plaintiff could not identify which defendant manufactured the paint that caused the injury. The **Skipworth** Court held that a claim under § 876 cannot succeed where the plaintiff cannot identify the specific party who acted in concert with the wrongdoer. **Id.** at 174-75.

In support of its holding, the **Skipworth** Court referenced **Burnside v. Abbot Lab., Inc.**, 505 A.2d 973 (Pa. Super. 1985). In **Burnside**, the plaintiffs sued the manufacturers of synthetic estrogen on a theory of industry-wide liability. **Burnside** held that a cause of action under § 876 is not viable where the plaintiff cannot identify the specific defendant who acted in concert with the wrongdoer. **Burnside**, 505 A.2d at 983-84. Likewise, **Skipworth** cited **Kline v. Ball**, 452 A.2d 727 (Pa. Super. 1982), wherein this Court rejected a § 876 claim where the injured plaintiff could not identify

---

[1] In his response to BMT's summary judgment motion, Appellant relied on subsections (b) and (c). Appellant's Opposition to BMT's Motion for Summary Judgment, 11/5/12, at ¶¶ 158-61. In his appellate brief, however, Appellant relies solely on subsection (b). We confine our analysis accordingly.

which of several high school boys dared another to knock a trash can off a railing. Despite its decision to affirm the compulsory nonsuit entered against the plaintiff, the *Kline* Court wrote that the plaintiff's theory under § 876 had merit and might apply to another case with similar facts. *Id.* at 728; *see also Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963 (Pa. Super. 1985) (holding that no § 876 cause of action would lie where the plaintiff could not identify which automobile parts manufacturer produced the tire and rim assembly that caused his injury). In summary, the *Skipworth* Court found this Court's interpretations of the concert of action theory under § 876 "eminently reasonable" and expressly adopted them. *Skipworth*, 690 A.2d at 175.

Subsequently, in *Sovereign Bank v. Valentino and Ganter*, 914 A.2d 415 (Pa. Super. 2005), the plaintiff bank alleged that one of its loan officers, defendant Valentino, established loan accounts under fictitious names and used the loan proceeds for his personal benefit. *Id.* at 416-17. Defendant Ganter allegedly accepted checks drawn on the fictitious accounts and, in return, wrote checks to Valentino for smaller amounts. Ganter thereby profited from the scheme and helped Valentino "launder" the loan proceeds. *Id.* at 417. The bank alleged a cause of action under § 876, contending Ganter and Valentino acted in concert to defraud the bank.

This Court wrote that § 876 "addresses the tort of **civil aiding and abetting, which is also known as concerted tortious conduct**." *Id.* at

421 (emphasis added). The Court used "aiding and abetting" and "concerted tortious conduct" interchangeably throughout the opinion. For example, just prior to quoting at length from the bank's complaint, the **Valentino** Court described it as alleging a "concerted tortious conduct claim." **Id.** at 422. The bank's complaint, however, repeatedly referred to Ganter's conduct as "aiding and abetting" Valentino's fraudulent scheme. **Id.** at 422-23. Notwithstanding the varied terminology, the bank's cause of action arose in substance under § 876(b), and this Court treated it as such. **Id.** at 424. The **Valentino** Court upheld the plaintiff's verdict on the § 876 cause of action and remanded for entry of a larger damages award. **Id.** at 427.

Similarly, in this case, it is clear from Appellant's amended complaint and opposition to BMT's summary judgment motion that, in substance, he alleged a cause of action under § 876. That Appellant titled the claim "aiding and abetting fraud" rather than "concerted tortious action" is not significant, as is clear from **Valentino**. Because Pennsylvania recognizes causes of action under § 876, and because Appellant clearly alleged one (fraud is a tort, and Appellant alleges BMT aided and abetted Bentley's fraud), the trial court erred in concluding that Appellant alleged a nonexistent cause of action.[2]

---

[2] BMT's reliance on federal case law is misplaced. Federal courts look to whether a state's highest court has recognized a cause of action. The Eastern District of Pennsylvania has noted, correctly, that the Pennsylvania Supreme Court has not expressly recognized a claim for aiding and abetting fraud under § 876(b) (**Skipworth** addressed § 876(a)). **See, e.g., Fulton Bank, N.A. v.**

Next, we consider whether summary judgment was appropriate despite the trial court's errant reasoning. "It is well-settled that we may affirm the trial court's order on any valid basis." *Seneca Res. Corp. v. S & T Bank*, 122 A.3d 374, 387 n.13 (Pa. Super. 2015). BMT claims Appellant failed to produce sufficient evidence to avoid summary judgment on the § 876 action, even if Pennsylvania recognizes that cause of action. Appellant argues he produced enough evidence to create a genuine issue of material fact on his § 876(b) claim, inasmuch as it was evident that BMT was aware of Bentley's scheme and permitted him to use BMT accounts in furtherance of it. As noted above, § 876(b) applies where the actor "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself[.]" Restatement (Second) of Torts, § 876(b).

We first consider the knowledge element. BMT claims it cannot be liable unless BMT had actual knowledge of Bentley's scheme, whereas Appellant argues BMT must be held liable because it willfully ignored numerous red flags. The *Valentino* Court offered no specific analysis of the knowledge element, but the Court applied § 876(b) to a case in which the defendant and the underlying bad actor had a close relationship. There, Ganter's knowledge of

_____

*UBS Sec., Inc.*, 2011 WL 5386376 (E.D.Pa. Nov. 7, 2011). This is of no moment here, as *Valentino* relied on § 876(b) to impose liability for a fraudulent financial scheme, and *Valentino* is binding on this panel.

Valentino's fraudulent scheme was clear, inasmuch as Ganter wrote checks to Valentino in exchange for checks drawn on Valentino's fictitious accounts.

In other cases, the relationship between the § 876(b) defendant and the underlying bad actor was less clear. For example, in **Grimm v. Grimm**, 149 A.3d 77 (Pa. Super. 2016), the plaintiff's grandfather, elderly and in declining mental health, struck the plaintiff in the face with the handle of a shovel. **Id.** at 81. Plaintiff brought an action under § 876(b) against his grandfather's attorney, alleging the attorney led grandfather to believe that violence toward family members was appropriate. In upholding the trial court's order sustaining the attorney's preliminary objections, this Court wrote:

> As the comment to section 876 makes clear, concerted tortious action requires the secondary actor to have knowledge of the primary actor's tortious actions or the primary actor's tortious act must be foreseeable to the secondary actor. **See** Restatement (Second) of Torts § 876 cmt b ("although a person who encourages another to commit a tortious act may be responsible for other acts by the other, ordinarily he is not liable for other acts that, although done in connection with the intended tortious act, were not foreseeable by him").[3] In this case, that means Grandson was required to plead that [the defendant attorney] either knew that Grandfather was going to strike Grandson or that Grandfather's striking of Grandson was a reasonable foreseeable consequence of [the attorney's] statements to Grandfather.

**Id.** at 88. Thus, the **Grimm** Court held that § 876(b) could apply where the defendant knew of or could reasonably foresee the underlying bad actor's misdeed.

---

3 We observe that, in the text of the Restatement, comment "b" to § 876 applies to subsection (a).

- 11 -

The **Grimm** Court relied in part on **HRANEC Sheet Metal v. Metalico Pittsburgh, Inc.**, 107 A.3d 114 (Pa. Super. 2014), in which the plaintiff, a ductwork fabricator, alleged that the defendant, a scrap metal recycling facility, acted in concert with some of plaintiff's employees in stealing coiled stainless steel sheets from the plaintiff's inventory. The plaintiff alleged the defendant paid cash for the coils and failed to document the transactions in accordance with the Scrap Material Theft Prevention Act.[4] In reversing the trial court's order sustaining the defendant's preliminary objections, we reasoned that the defendant "knew or should have known" that the coils were stolen. **Id.** at 125. For multiple transactions, the defendant never confirmed that the persons to whom it paid cash were authorized to deliver the coils on behalf of the plaintiff; the defendant repeatedly failed to comply with provisions of the Scrap Material Theft Prevention Act; and the defendant failed to make any inquiry about the steady supply of new material it was receiving. "Such intentional ignorance is not sufficient to shield [defendant] from liability under the concerted tort statute." **Id.** The panel also wrote that the defendant encouraged the tortious conduct insofar as the plaintiff's employees knew they could receive cash for new coils with no questions asked. Thus, the **HRANEC** Court relied on the defendant's "intentional ignorance" in

---

[4] 73 P.S. § 1943.1, *et. seq.*

- 12 -

concluding that the defendant knew or should have known it was participating in tortious conduct.[5]

The United States District Court for the Eastern District of Pennsylvania considered a case with facts somewhat analogous to the instant matter. In **Resolution Trust Corp. v. Farmer**, 823 F. Supp. 302 (E.D.Pa. 1993), **abrogated in part on other grounds as stated in Resolution Trust Corp. v. Baker**, 1994 WL 637359, (E.D.Pa. Nov. 14, 1994), the receiver alleged a § 876(b)[6] claim against former officers, directors, and lawyers of a failed savings and loan ("S&L") association, alleging that they knowingly permitted the S&L to engage in high-risk, poorly documented lending practices. With regard to knowledge, the court wrote:

> Although, mere unknowing participation in another's [wrongful act] is an improper predicate to liability, the requirement of knowledge may be less strict where the alleged aider and abettor derives benefits from the wrongdoing. Even in such a situation, the proof offered must establish conscious involvement in impropriety or constructive notice of intended impropriety. Such involvement may be demonstrated by proof that the alleged aider-abettor had general awareness that his role was part of an overall activity that is improper.

**Id.** at 309 (internal citations and quotation marks omitted). The plaintiff alleged the lawyer defendants "knew or recklessly failed to discover the wrongful conduct of the Director/Officer Defendants . . . and substantially

---

[5] The **HRANEC** Court analyzed all three subsections of § 876 and was not specific as to which it applied.

[6] **See id.** at 309 n.11.

- 13 -

assisted in the performance of such wrongful conduct[.]" *Id.* Those allegations were sufficient to state a claim under § 876(b). *Id.*

Given this Court's analysis in *Grimm* and *HRANEC*, and the persuasive authority of *Farmer*, we conclude that a defendant's actual knowledge of the underlying tort is not necessary to sustain a cause of action under § 876(b). Rather, if the defendant knew or should have known of the underlying bad actor's misdeeds, but instead exhibited intentional ignorance, as in *HRANEC*, the knowledge element of § 876(b) is satisfied.

In this case, as we explained above, evidence produced in discovery reveals that Entrust was a sole proprietorship that allowed Bentley to serve as custodian of his investors' CDs and thereby eliminated the oversight of a custodian bank. Plaintiff's Answer in Opposition to Defendant's Motion for Summary Judgment, 11/5/12, at ¶¶ 10-11 (citing the expert report of Charles L. Williams). Federal Reserve investigators were ill at ease with this arrangement: "Equally disturbing is the fact that Mr. Bentley serves as custodian for the same CDs he is brokering even though he is not a registered custodian as required by statute." *Id.* at ¶ 42 (citing a Memorandum of the Federal Reserve Bank of Philadelphia, attached as Exhibit "OO" to Plaintiff's Answer in Opposition to Defendant's Motion for Summary Judgment and filed under seal). When Bentley opened his wire and deposit accounts at BMT, BMT was required, according to its own industry-standard KYC program, to monitor "out of the ordinary or suspicious activity that is not in keeping with the known

and usual customer activity[.]" *Id.* at ¶¶ 26-27. The KYC program was designed to "deter, detect and prevent all forms of fraudulent and money laundering activity and suspect transactions that may be directed at the Bank." *Id.* at 27.

As stated above, Bentley abruptly withdrew his application for a line of credit when BMT conditionally approved the line of credit pending, among other things, a favorable credit reference from Main Line Bank. Notably, however, BMT did not confirm the existence of $2 million in CDs or other collateral to secure the line of credit, and closing the line of credit was not conditioned on proof of adequate collateral. *Id.*, Exhibit H., at 13-21. After Bentley withdrew his application for the line of credit, BMT did not contact Main Line to verify Bentley's business model or the solvency of his entities. *Id.* at ¶¶ 45-55.

BMT counters that there was no need for a credit reference after Bentley withdrew his request for the line of credit, but several of its officers admitted they feared that contacting Main Line would have prompted Main Line to attempt to thwart BMT's efforts to bring Bentley in as a customer. *Id.* at ¶¶ 52-54. Also, BMT notes that deposit accounts do not pose the same risk to a bank as a $2 million line of credit. Regardless, BMT was aware that the $2 million line of credit was critical to the operation of Bentley's businesses, but none of the financial statements or other information provided to BMT confirmed its existence. *Id.* at ¶¶ 61-74.

Furthermore, when Bentley's heavier than expected use of his BMT wire accounts caused him to incur unexpected fees (due to a lower than expected balance), BMT agreed to modify the fee structure. *Id.* at ¶¶ 96-104 and Exhibits DD and EE. The volume of transactions through the wire account was roughly three times what BMT expected (based on Bentley's Main Line Bank statements from a single month, September of 1997), but BMT apparently did not inquire into the reasons for the heavy usage and low balance. *Id.* Appellant's expert wrote that the large increase in account activity should have been a red flag. *Id.,* Exhibit H at 33.

> This is especially true considering that BMT knew that Bentley had to have a $2 million line of credit at Main Line Bank to operate his business, but did not have that line of credit facility when he moved his banking relationship to BMT. BMT should have had serious questions about how Bentley was able to fund his business activity that had increased three fold when he did not have a credit facility to use to finance his business activity.

*Id.*, Exhibit H at 33-34. BMT's failure to investigate violated its KYC policy. *Id.,* Exhibit H, at 34-39.

To summarize, Appellant produced evidence that Bentley was a very large and profitable customer for BMT. BMT, considering itself to be in competition with Main Line for Bentley's business, conditionally approved a $2 million line of credit but did not seek proof that Bentley or his businesses had $2 million in collateral. BMT offered Bentley very favorable fees to move his business to BMT, and further accommodated Bentley when the high volume of activity on his wire accounts resulted in additional unexpected fees. BMT

never inquired as to the reason for the much higher than expected volume of transactions through the wire account, and never confirmed that Bentley had a line of credit sufficient to support the high volume of business. Moreover, Bentley as the principal owner of BFS, also operated Entrust as a sole proprietorship that was to act as custodian for investor funds. Bentley essentially controlled investor funds both as the broker-dealer and as custodian, an arrangement that let the proverbial fox into the hen house. From the outset of its relationship with Bentley, BMT failed in many respects to follow its own KYC policy. BMT profited from its relationship with Bentley, and we conclude that a genuine issue of material fact existed as to whether BMT exercised intentional ignorance toward Bentley's unlawful activity. **HRANEC**, 107 A.3d at 125.

Next, we consider whether BMT offered substantial assistance or encouragement to Bentley. Per the comment to § 876, we will consider "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, [and] his relation to the other and his state of mind[.]" Restatement (Second) of Torts § 876 cmt d. In addition to these factors, courts often consider the duration of the assistance (**Bair v. Purcell**, 500 F. Supp. 2d 468, 496 (M.D. Pa. 2007)), and the foreseeability of the harm that occurred (**Jefferis v. Commonwealth**, 537 A.2d 355, 358 (Pa. Super. 1988)). We consider both of these additional factors significant in this case.

Much of the same evidence relevant to BMT's knowledge is relevant here. BMT enticed Bentley as a customer with an attractive fee package and without a thorough analysis of the financial health of Bentley or his businesses, violating its own KYC policy. BMT further adjusted its fee structure to accommodate the high volume of transactions, again without making inquiries in accord with its KYC policy. These actions and inactions were of assistance to Bentley in perpetuating his Ponzi scheme.

Regarding BMT's relationship and presence with Bentley during his unlawful activity, the summary judgment record reflects that BMT's officers remained in close communication with Bentley, BMT's largest customer, for the duration of the banking relationship. Likewise, Bentley's Ponzi scheme spanned the duration of his banking relationship with BMT. That relationship spanned roughly four years before BMT terminated it. The harm that occurred—Bentley defrauding his investors—was foreseeable, given Bentley's unusual and unexpected use of his deposit accounts, and BMT's apparent failure to adhere to its own KYC policy.

Based on all of the foregoing, we conclude the trial court committed legal error in granting summary judgment on Appellant's aiding and abetting claim. The evidence before us, construed in a light most favorable to Appellant, establishes a triable issue of fact as to Appellant's § 876 cause of action, as that action has been construed by Pennsylvania jurisprudence. The trial court abused its discretion in granting BMT's summary judgment motion.

### B.   Motion for a New Trial

Appellant argues that he is entitled to a new trial because the trial court committed prejudicial error by permitting BMT to admit evidence that, as receiver, he failed to mitigate damages by incurring legal fees and committing to an early CD redemption strategy.

(i)      Standard of Review

The standard of review of an appellate court reviewing a trial court's decision denying a motion for a new trial is as follows:

> [I]t is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial.
>
> * * *
>
> Thus, when analyzing a decision by a trial court to grant or deny a new trial, the proper standard of review, ultimately, is whether the trial court abused its discretion.
>
> **Harman ex rel. Harman v. Borah**, [ ] 756 A.2d 1116, 1122 (Pa. 2000).
>
> Moreover, our review must be tailored to a well-settled, two-part analysis:
>
> We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial.  If the alleged mistake concerned an error of law, we will scrutinize for legal error.  Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial.

**ACE Am. Ins. Co. v. Underwriters at Lloyds and Co.**, 939 A.2d 935, 939 (Pa. Super. 2007) (**citing Salsitz v. Allentown Hosp.**, 814 A.2d 766, 771 (Pa. Super. 2002)), **aff'd**, 971 A.2d 1121 (Pa. 2009).

(ii)     Mitigation of damages

A party who suffers a loss has a duty to make a reasonable attempt to mitigate damages, but the burden is on the party who breaches the contract to show how further loss could have been avoided through the reasonable efforts of the injured party. *Ecksel v. Orleans Construction Co*., 519 A.2d 1021 (Pa. Super. 1987), *Forest City Grant Liberty Assocs. v. Genro II, Inc.*, 652 A.2d 948, 952 (Pa. Super. 1995). Thus, a defendant will not be penalized beyond the extent of the plaintiff's damages and the plaintiff will not be rewarded for its failure to mitigate. *Id.* In addition, it is axiomatic "that the doctrine of mitigation of damages addresses the *amount* of damages to be awarded once liability has been established; it has no bearing whatsoever on the underlying determination of liability." *Collincini v. Honeywell, Inc.*, 601 A.2d 292, 297 (Pa. Super. 1991) (italics in original; *disapproved on other grounds*, *Walnut Street Assoc., Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468 (Pa. 2011)), *appeal denied*, 608 A.2d 27 (Pa. 1992), *cert. denied*, 506 U.S. 869 (1992).[7] Appellant contends that the trial court erred in admitting BMT's evidence alleging that he, as receiver, failed reasonably to mitigate damages. Specifically, Appellant contends BMT's criticism of legal fees incurred by the receiver and the receiver's early redemption of CDs was

---

[7] In both contract and tort cases, an injured plaintiff cannot recover damages for losses that could have been avoided with reasonable effort. *Cf.* Restatement (Second) Contracts § 350, Restatement (Second) of Torts § 918.

prejudicial evidence improperly admitted at trial now entitling him to a new trial.

> ### a. Attorneys' Fees.

Appellant argues that BMT improperly employed an attack-the-receiver strategy from its opening statement through trial to argue to the jury that the receiver could have recovered investors' money faster if he had not aggressively pursued a lot of litigation and that instead, the receiver was motivated by greed. Appellant argues that BMT was permitted, over repeated objections, not only to question fees incurred from the beginning of the receivership, but also to question the wisdom of his litigation strategies. Appellant contends that the court improperly allowed BMT's damage expert to testify that the receiver's legal strategy was flawed and that not pursuing those strategies would have better served investors. Appellant complains that BMT's damage expert was allowed to speculate concerning the amount of money spent on attorneys' fees at $250,000 per month between 2001 to 2003 based upon a made-up hourly rate for five to six attorneys. Appellant argues that these fee numbers were speculative and misleading, since the expert attempted to extrapolate from fees spent by the receiver unrelated to any litigation strategy. Appellant argues that the jury was improperly permitted to conclude that had he pursued a different legal strategy there would not have been the need for this litigation because the money that went to fees would have gone to investors. Appellant further claims the trial court

exacerbated this error by instructing the jury that it "may not award damages in the nature of legal fees but may consider damages relative to the early redemption of the certificates of deposit." N.T. Trial, 3/16/18, at 107-08. Appellant claims this instruction was inadequate and confusing because he was not seeking attorneys' fees as part of his damage claim. Appellant maintains the instruction did not explain that the receiver's actions and expenses were irrelevant as the damages claimed preceded his appointment. Finally, Appellant repeatedly argues that BMT's improper defense strategy produced a gross injustice because references to legal fees that his law firm collected were designed to suggest to the jury that the receiver in bringing this litigation created investor losses. Appellant's Brief at 35-40.

In defense, BMT claimed Appellant ran up excessive attorneys' fees throughout the course of his tenure as receiver, including this action, thereby depleting the money available to remunerate Bentley's victims.[8] BMT argues that the receiver's aggressive litigation strategy resulted in his initiating at least three costly lawsuits, including the present one, that produced no benefit for investors, but only substantial financial benefit for the firms at which the receiver was a member, facts which Appellant had no right to conceal from

---

[8] The fees Appellant paid to his law partners came from the pool of funds in Bentley's portfolio. N.T. Trial, 3/14/18, at 153-54. Appellant lodged numerous objections to BMT's examination of its defense expert on Appellant's counsel fee expenditures. N.T. Trial, 3/15/18, at 204-06, 21. Appellant also objected to BMT's cross-examination of him regarding the fees his law firms received while he was receiver. N.T. Trial, 3/14/18, at 148-52.

- 22 -

the jury. BMT further maintains its expert did not engage in speculation by testifying the receiver incurred $250,000 per month in fees between 2001 and 2003, as this number was based upon documents provided through discovery. BMT argues that it did not present evidence of attorney fees in support of any affirmative claim for fees, but rather, introduced this evidence solely to demonstrate that the receiver had resources at his disposal he could have used to satisfy investor claims without having to sue BMT. Finally, BMT argues that the admission of attorney fee evidence is moot because the jury did not believe damages were appropriate in any event, since Appellant failed to prove that BMT had anything to do with Bentley's enterprise. Appellee's Brief at 57-62.

In our view, the attorneys' fees evidence was simply irrelevant[9] to any cause of action or to any alleged duty of Appellant to mitigate damages. As stated, mitigation evidence has no relevance to issues of liability. ***Collincini,*** 601 A.2d at 297. Respecting damages, Appellant sought to recover losses to investors stemming from the four-year period during which Bentley maintained accounts at BMT. Amended Complaint, 8/1/12, at ¶¶ 17-61; N.T. Trial, 3/12/18, at 44; N.T. Trial, 3/15/18, at 187-95. Appellant claimed BFS was $3 million in debt in late 1997 when Bentley began his relationship with BMT, and $23 million in debt in October of 2001 when the banking relationship

---

[9] Evidence is relevant if it has any tendency to make a consequential fact more or less probable than it would be without the evidence. Pa.R.E. 401.

ended, for a net loss of $20 million. N.T. Trial, 3/12/18, at 44; N.T. Trial, 3/15/18, at 195. Appellant did not seek to recover attorney's fees for this period nor for any other time. BMT does not argue otherwise, but instead, argues only that the incurring of attorney's fees reduced funds available to reimburse investors thereby constituting a failure to mitigate damages.

Often an injured party will incur costs in an attempt to mitigate damages, and it is beyond dispute that the injured party may claim those costs as damages. Restatement (Second) Contracts § 347(b) and cmt. c (incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss). *See also Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149-50 (3rd Cir. 1990) (the corollary to the principle established in New Jersey and elsewhere, that one wronged by the actions of another is required to mitigate damages, is that a wronged party may recover for expenditures made in a reasonable effort to avert the harm caused by a defendant). What is reasonable or excessive in terms of costs may be a triable issue, but since Appellant did not claim fees as damages, the reasonableness of those fees was not at issue in this case and, therefore, irrelevant to any damages claimed in this litigation.

Just as problematic was BMT's use of fees as a mitigation defense done with the benefit of hindsight to question the receiver's litigation strategy. Whether or not it is reasonable to pursue litigation and incur fees cannot be determined, as BMT has done, by looking at the ultimate outcome of a case.

Rather, if the issue is relevant, the decision must be viewed under the circumstances existing as of the time the decision was made to pursue litigation. Reasonableness "is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented." **Prusky v. Reliastar Life Insurance Co.**, 532 F.3d 252, 259 (3rd Cir. 2008) (**citing In re Kellett Aircraft Corp.**, 186 F.2d 197, 198 (3rd Cir. 1950)). To hold otherwise retroactively punishes a claimant for an adverse outcome based upon a reasonable decision to pursue litigation when made. BMT's argument that the receiver pursued at least three suits that produced no benefit to the estate questions the receiver's judgment based upon outcome and not the wisdom of the decision when made to pursue those claims.[10] Obviously, BMT's mitigation argument would fail if the receiver had succeeded in any of those other claims, but that analysis likewise comes into view only with the benefit of hindsight.

---

[10] We note further that even if relevant, BMT provided no expert legal testimony to establish that the receiver, through counsel, made decisions that fell below the relevant standard of care in order to establish that counsel's actions were unreasonable. **See Storm v. Golden**, 538 A.2d 61 (Pa. Super. 1988) (expert testimony generally is necessary to establish negligent practice in any profession and the requirement applies equally in legal malpractice claims, as for example where a complex determination is required of a claim of breach of duty involving an attorney's choice of trial tactics in which a layperson's judgment obviously requires guidance).

We also find merit to Appellant's argument that if courts permit evidence of legal fees incurred to pursue a claim as evidence of a failure to mitigate damages, then every damages verdict would be subject to reduction by the amount of those fees. When fees are not claimed as a part of damages, a defendant is not entitled to claim the benefit of fees expended by an opposing party to mitigate damages caused by his wrongful conduct. To hold otherwise would leave an injured party in the position of either not pursuing a culpable party, or having its claim reduced by fees incurred to hold a responsible party liable for damages. Such an argument holds a plaintiff at an unfair advantage and allows a culpable defendant to use the fact of the plaintiff's suit as a sword against the plaintiff to reduce his own liability for damages.

Further, we agree that BMT's expert testimony regarding the amount of fees and how they were incurred was impermissibly speculative.

> Expert testimony is incompetent if it lacks an adequate basis in fact. The expert is allowed only to assume the truth of testimony already in evidence. While an expert's opinion need not be based on an absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. ***Veiner v. Jacobs***, 834 A.2d 546, 558 (Pa. Super. 2003); ***see also Cuthbert v. City of Philadelphia***, [ ] 209 A.2d 261, 264 (Pa.1965).

***Wright v. Eastman***, 63 A.3d 281, 283 (Pa. Super. 2013). However, contrary to Appellant's assertion, it does appear that BMT's expert arrived at $250,000 per month as the average of legal fees from October 23, 2001 through the

end of 2004,[11] based upon discovery documents. Nonetheless, there does not appear to be any basis in fact for the hourly rate assumed of $285 an hour, or for the number of attorneys who worked on this project or any other matters.[12] N.T. Trial, 3/15/18, at 205-06. Nor did BMT attempt to review the reasonableness of time spent by whatever number of attorneys worked on this or other projects. By assuming various scenarios, including the most aggressive scenario that employed five attorneys, without any analysis of whether the work performed was necessary, BMT's damages expert was allowed to speculate and to manipulate his calculations to produce a desired result. Moreover, we agree that this expert's wholesale inclusion of legal fees for all professional services rendered to the receiver—even outside this litigation—impermissibly allowed the jury to conclude that the receiver should

_____

[11] The fees Appellant paid to his law partners came from the pool of funds in Bentley's portfolio. N.T. Trial, 3/14/18, at 153-54. Appellant lodged numerous objections to BMT's examination of its defense expert on Appellant's counsel fee expenditures. N.T. Trial, 3/15/18, at 204-06, 221. Appellant also objected to BMT's cross-examination of him regarding the fees his law firms received while he was receiver. N.T. Trial, 3/14/18, at 148-52.

[12] BMT's defense expert, Paul Pocalyko, calculated alternative scenarios in which the receiver would have employed zero, one, two, three, four and five full-time attorneys. Pocalyko calculated the receiver incurred legal fees of approximately $250,000 per month from 2001 through 2003, equivalent to paying five attorneys $285 per hour, eight hours per day. He offered his opinion that had the receivership not incurred legal fees it would have had funds necessary to distribute 100% of allowed claims by February 28, 2005. Employing five full-time attorneys would have allowed for full distribution as of February 28, 2007. *Id.* Defendant's Exhibit 101, Supplemental Expert Report of Paul W. Pocalyko, at 12-13.

have incurred no fees at all. This is an untenable position that would preclude a receiver from fulfilling his or her court obligation to marshal all of an estate's assets for the benefit of its claimants. If adopted, it would relieve BMT and other similarly situated parties of the prospect of facing any litigation.

BMT further argues that any error was harmless because the attorneys' fee evidence was relevant to damages, a question the jury never reached. "The harmless error doctrine underlies every decision to grant or deny a new trial." **Grove v. Port Auth. of Allegheny Cty.**, 218 A.3d 877, 888 (Pa. 2019). "A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." **Id.** "Further, 'when improperly admitted testimony may have affected a verdict, the only correct remedy is the grant of a new trial.'" **Deeds**, 110 A.3d at 1012 (quoting **Greisser v. National R.R. Passenger Corp.**, 761 A.2d 606, 608 (Pa. Super. 2000)).

BMT relies on our Supreme Court's opinion in **Hart v. W.H. Stewart, Inc.**, 564 A.2d 1250 (Pa. 1989) (plurality). There, the trial court erroneously permitted evidence that the injured plaintiff continued to receive his full salary after his injury. The jury found the defendant not liable on the plaintiff's design defect claim and therefore did not reach damages. The Supreme Court held that erroneously admitted damages evidence is harmless where the jury has found for the defendant on the liability issue. **Id.** at 1252. **Hart** is

factually distinguishable because there is no indication that the defendant *Hart* argued that the plaintiff filed suit to enrich himself. Further, only two of the six sitting Justices signed the opinion announcing the judgment of the court. The other four concurred in the result only. Thus, even if the *Hart* OAJC intended to create a blanket rule on this issue, it did not create binding precedent.

BMT also relies on *Valentine v. ACME Markets*, 687 A.2d 1157 (Pa. Super. 1997), in which the trial court erroneously admitted evidence of the slip-and-fall plaintiff's prior and subsequent falls. The trial court reasoned that the plaintiff's repeated falls could have been related to a medical condition and not to a defectively designed checkout counter. *Id.* at 1160. This Court concluded that the trial court erred because there was no evidence as to the cause of the plaintiff's other falls. *Id.* The error permitted the jury to conclude that the plaintiff repeatedly slipped and fell for no apparent reason. *Id.* Nonetheless, this Court found the error harmless because the jury found no design defect. *Id.* The instant case is distinguishable because, as we discuss in more detail below, BMT expressly invited the jury to consider whether Appellant brought this action for the benefit of his law firm rather than for Bentley's victims. Furthermore, *Valentine* did not create a blanket rule holding that evidence erroneously admitted on a question the jury did not reach can never taint the jury's finding on a question it did reach.

More to the point is ***Deeds v. Univ. of Pennsylvania Med. Ctr.***, 110 A.3d 1009, 1012 (Pa. Super. 2015), ***appeal dismissed***, 128 A.3d 764 (Pa. 2015), wherein this Court ordered a new trial, based on a violation of the collateral source rule, even though the jury found the defendant not liable.

> While the primary focus of the collateral source rule is to avoid the preclusion or diminution of the damages otherwise recoverable from the wrongdoer based on compensation recovered from a collateral source, in some instances, the violation of the collateral source rule can affect the jury's deliberation and decision on the issue of liability.

***Deeds***, 110 A.3d at 1013 (quoting ***Nigra v. Walsh***, 797 A.2d 353, 360 (Pa. Super. 2002)); ***see also***, ***Lobalzo v. Varoli***, 185 A.2d 557, 561 (Pa. 1962) ("When an error in a trial is of such consequence that, like a dash of ink in a can of milk, it cannot be strained out, the only remedy, so that justice may not ingest a tainted fare, is a new trial.").

Instantly, we note the following statement in BMT's brief to this Court: "At least three [lawsuits], including the present one, **produced no benefit for Bentley's investors but substantial financial benefit, in the form of legal fees, for the law firms at which [Appellant] was a member at the time.**" BMT's Brief at 57 (emphasis added). This statement from BMT's Brief echoed its opening argument at trial:

> Another thing [the defense expert] will tell you is that [Appellant] could have recovered the investors' money even faster . . . if he had not aggressively pursued a lot of litigation. From the sampling of records we have, [Appellant] was spending $250,000 a month on legal fees, **most of which were going to the law firm where he was a partner.**

N.T. Trial, 3/12/18 records, at 61-62 (emphasis added). Thus, at the very opening of trial BMT invited the jury to infer that Appellant filed meritless lawsuits, including this one, for the financial benefit of his law firm rather than the financial benefit of Bentley's victims. Because the fee evidence from this case and several others filed by Appellant as receiver was not relevant to the merits of any of the causes of action that went to the jury, and because BMT invited the jury to consider it for that purpose and to prejudice the jury against the receiver and his law firm, we conclude, in accord with **Deeds**, that the trial court's error was not harmless.

We further conclude that the trial court's attempt to provide a curative instruction regarding the jury's consideration of fees does not require a different result: "If you believe that damages are appropriate in this case, **you may not award damages in the nature of legal fees** but may consider damage relative to the early redemption of the certificates of deposit." N.T. Trial, 3/16/18, at 107-08 (emphasis added). As we explained above, Appellant was not seeking to recover fees. Rather, BMT insinuated that Appellant incurred excessive fees at the expense of the receivership estate. To the extent the trial court intended this instruction to alleviate any unfair prejudice arising from its decision to admit evidence of Appellant's counsel fees, the court missed the mark. The instruction did not address Appellant's concern that the jury not be permitted to consider BMT's argument that if fees

were not incurred, more money would have been available to distribute to investors.

Upon review, we conclude that the attorneys' fee evidence, admitted ostensibly for the purpose of demonstrating a failure to mitigate damages, was admitted in error, that the error was not harmless, and that the trial court's denial of Appellant's motion for a new trial based upon this error was an abuse of discretion.[13]

### b. Liquidation and Redemption of CDs

Appellant sets forth several arguments in support of his position that the trial court erred in permitting the jury to consider the effect of Appellant's early redemption of CDs under BMT's mitigation of damages defense. Appellant argues that as receiver, he was entitled to the same immunity as a court trustee in bankruptcy who acts in accord with court-approved decisions. Permitting BMT to challenge his federal court-approved decision as receiver to redeem and liquidate CDs was an attempt to collaterally attack and set aside a valid court order. Appellant also contends it was error to allow BMT to assert that he violated a court order that permitted him to hold CDs to their maturity. On the substance of BMT's mitigation defense, Appellant argues his liquidation and redemption strategy of CDs was irrelevant to his claim for damages, since

---

[13] Because we find prejudicial error in the trial court's admission of attorneys' fee evidence, we do not address BMT's argument that Appellant's § 876 claim was doomed to fail even if the trial court had not granted summary judgment on that claim.

the claimed damages arose years prior to trial and years after BMT's wrongful conduct. More to the point, Appellant contends that his litigation and redemption strategies were not proper evidence of a failure to mitigate damages, but just the opposite: those strategies demonstrated that as receiver, he acted prudently to mitigate damages and fulfill his duties to marshal and distribute funds to the victims.

In response, BMT argues that its sole motivation to introduce evidence regarding the receiver's premature liquidation of CDs was to demonstrate the negative impact on the estate and that if the receiver had not done so, sufficient funds would have been available to repay investors fully. BMT also disputes that the receiver should enjoy immunity for his actions.

We reject Appellant's claim that, as receiver, he was entitled to immunity for his actions because they were approved by the district court and, therefore, BMT should have been precluded from challenging his early redemption of CDs. Our state law is silent as to whether and to what extent the duty to mitigate damages should apply when the plaintiff is a court-appointed receiver. Appellant, citing **Atlantic Tr. Co. v. Chapman**, 208 U.S. 360, 364 (1908), and **Witt v. Commonwealth**, 425 A.2d 374, 376 (Pa. 1981) (plurality), asserts that his status as an officer of the court should preclude BMT from challenging his court-approved liquidation and redemption strategy. While both of these cases support the general proposition that Appellant, as a receiver, may be considered an agent of the court, neither of these cases goes

so far as to hold that this status insulates him from affirmative defenses asserted by third parties in response to suit initiated by the receiver against those parties.

Citing **Yadkin Valley Bank & Tr. Co. v. McGee**, 819 F.2d 74, 76 (4th Cir. 1987), Appellant further attempts to draw an analogy between himself and bankruptcy trustees, who enjoy immunity from suit where they act with the approval of the bankruptcy court after full disclosure to the court and creditors. However, Appellant recognizes that immunity from suit is not pertinent here, as Appellant is not the defendant. Nonetheless, Appellant argues from **Chapman**, **Witt**, and **Yadkin** that BMT's mitigation of damages defense must fail because actions Appellant took with approval of the federal court and are not subject to question in this state court action. Appellant cites no authority for this proposition and woefully underdevelops his argument to support an extension of immunity to defeat affirmative defenses raised to a receiver suit. Moreover, our research has revealed no authority to extend official immunity as far as Appellant suggests. We note, however, our concern with any position that would allow a receiver to use immunity as both a sword and a shield in an action brought by a receiver against third parties.

We do observe that in **O'Melveny & Myers v. Federal Deposit Ins. Corp.**, 512 U.S. 79 (1994), the United States Supreme Court held that state law governs the available defenses to a receiver's state law cause of action. There, the FDIC, as receiver, sued a failed S&L's former counsel for

malpractice. The federal district court granted summary judgment, concluding that the receiver stood in the shoes of the S&L and therefore could not prosecute the alleged wrongdoing of insiders. A unanimous Supreme Court reversed, holding that California law, rather than federal common law, governed the "imputation of knowledge to corporate victims of alleged negligence." *Id.* at 84-85. The *O'Melveny* Court also examined whether federal law preempted state law on the point in question, noting that it "would not contradict an explicit federal statutory provision" and would not "adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed[.]" *Id.* at 85. The Court examined the federal statute governing the FDIC's powers and duties as receiver and found no basis for displacing California law in that case. *Id.* at 85-87.

Prior to *O'Melveny*, some federal courts held that the FDIC, when acting as receiver, had no duty to mitigate damages. *See Resolution Trust Corp. v. Farmer*, 823 F. Supp. 302, 312 (E.D.Pa. 1993) (holding that RTC, as receiver, owed no duty to mitigate damages in discharging its discretionary actions as receiver); *Federal Deposit Ins. Corp. v. White*, 828 F. Supp. 304 (D.N.J. 1993) (holding that the parties responsible for the failed bank would not have their liability "excused or diminished" because of the alleged

mistakes of the receiver). After **O'Melveny**, lower federal courts split on whether the "no duty" rule survived.[14]

For our purposes, **O'Melveny** clarifies that, absent federal preemption, state law governs the available defenses to a receiver's state law causes of action. As stated above, an injured party under Pennsylvania law has a duty to take reasonable action to mitigate damages when that party suffers a loss. We know of no exception under our state law that would insulate a receiver from this duty when asserted as an affirmative defense to suit initiated by a receiver against a third party. Thus, Pennsylvania law does not prohibit BMT's mitigation of damages defense. The question is whether the defense has any merit.

First, we reject Appellant's assertion that his actions postdating the period in which damages were incurred are irrelevant to a claim that there was a failure to mitigate damages. All attempts at mitigation occur after an initial loss occurs. Instead, we believe the pertinent inquiry is whether Appellant acted reasonably. BMT claims Appellant should have held CDs longer to accrue a larger amount of income. Had he done so, BMT argues, he could have compensated the victims in full without incurring legal fees.

_____

[14] **Compare RTC v. Massachusetts Mut. Life Ins. Co.**, 93 F. Supp. 2d 300 (W.D.N.Y., 2000) (holding that the no duty rule did not survive **O'Melveny**), **with FDIC v. Healy**, 991 F. Supp. 53 (D. Conn. 1998) (holding that the no duty rule survived **O'Melveny**). An exhaustive review of **O'Melveny** and its progeny would be outside the scope of this opinion.

As noted above, the duty to mitigate damages is one whereby an injured party is expected to take reasonable action to avoid further loss. Allowed investor claims were set at $369.9 million as reported by the receiver as of August 30, 2002. *See* Defendant's Trial Exhibit 100, Expert Report of Paul W. Pocalyko, at 5. In other words, Appellant would have made Bentley's investors whole by paying this amount. Ultimately, Appellant compensated the investor victims 92% of their allowed claims.[15] Appellant therefore did not cause further loss to investors, but instead recouped almost the whole of allowed investor claims. BMT proposed an alternative mitigation strategy that it claims could have resulted in a 100% payment of allowed claims as of March 31, 2007, if investor funds were held longer to accrue additional interest, *id.* at 11, and by February 28, 2005 had the receiver not incurred legal fees. *Id.* at 13. In effect, BMT argues that a better mitigation strategy was available to the receiver.

We will address the merits of BMT's proposed mitigation strategy in detail below. We note at the outset that BMT's legal argument rests on a flawed premise:

> Where a choice has been required between two reasonable courses, the person whose wrong forced the choice cannot complain that one rather than the other was chosen. The rule of mitigation of damages may not be invoked by a contract breaker

---

[15] It is not clear to us when final distribution to 92% of allowed claims was achieved, but it is certain that percentage was reached prior to any other alternative mitigation date suggested by BMT.

as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter. One is not obligated to exalt the interests of the defaulter to his own probable detriment.

**Kellett**, 186 F.2d at 198.[16] Thus, the existence of an alternative mitigation strategy does not establish that the injured party's strategy was unreasonable.

To place the parties' arguments in context, we set forth in detail our understanding of Bentley's Ponzi scheme and how it relates to the receiver's mitigation efforts and BMT's critique thereof. Appellant testified that he was under pressure from Bentley's investors, as well as the SEC, the FDIC, and the Federal Reserve, to recover as much money as possible and as quickly as possible because many of the investors were in serious financial distress. N.T. Trial, 3/14/18, at 129-30. Appellant testified that some of the instruments were for more than $100,000—above the limit for FDIC insurance at the time, and he was concerned that the issuing banks would go out of business prior to the instruments' maturity date. **Id.** at 134-35. The victims received 92% of their lost principal as of the time of trial. **Id.** at 144. Thus, Appellant claims he undertook a reasoned—and court-approved—strategy that resulted in quicker, but less than full, compensation to Bentley's investors.

---

[16] Although not binding on us, we may cite federal authority for its persuasive value. **Bochetto v. Piper Aircraft Co.**, 94 A.3d 1044, 1050 (Pa. Super. 2014).

Pre-recorded testimony of Robert Bentley was introduced at trial.[17] Bentley explained that his troubles and hence, his illegal scheme, began in June 1996 after he forged his then-accountant's name to a Main Line document, leading the bank to withdraw a $2 million line of credit that had been fully drawn. Plaintiff's Trial Exhibit 141, Testimony of Robert Bentley, 3/12/18, at 57:05 to 57:17; 102:18 to 102:23.[18] In order to make payment to Main Line, Bentley created fraudulent CDs to sell to investors. *Id.* at 57:10 to 57:17. Bentley told investors he had one-year CDs at an interest rate he made up to sell the fraudulent CDs. *Id.* at 103:13 to 103:17. By doing so, he no longer had dollar for dollar, asset for asset and thus was "under water". *Id.* at 57:05 to 57:17. Investors wired in funds to purchase the fraudulent CDs and instead of purchasing CDs, Bentley used the money to pay off the $2 million line of credit to Main Line. *Id.* 103:18 to 103:23. As a broker of CDs, Bentley sold CDs to institutional investors. *Id.* at 66:11 to 66:15. The money was to flow through a custodian, not BFS, to purchase CDs from issuing banks and then back through the custodian when CDs matured so that principal and interest could be paid back to investors and commissions to Bentley as the

_____

[17] As part of his guilty plea arrangement with the federal government, Robert Bentley was obligated to cooperate fully with the government in its investigation of his fraudulent scheme, as well as with the receiver and anyone else who requested his assistance. Plaintiff's Trial Exhibit 141, at 171:15-171:05 (reference is to the page and line number as it appears in the exhibit).

[18] The references are to the page and line numbers, as they appear in the Exhibit.

broker. *Id.* at 17:04 to 17:21. Initially, Bentley used Kislak National Bank as a custodian. *Id.* at 74:02 to 74:08. Eventually, Bentley formed Entrust as a sole proprietorship to act as custodian. *Id.* at 32:21 to 33:01. Unlike a corporation that would have to be a SEC-registered entity, Entrust, with Bentley as the sole proprietor, was not required to similarly register and could act as a custodian for CDs under Pennsylvania law. *Id.* at 33:05 to 34:04. With BFS and Entrust under Bentley's control, Bentley was impermissibly able to commingle new funds with funds returned by issuing banks that were to be repaid to investors. *Id.* at 133:01 to 133:06. Bentley, therefore, had access to all incoming and outgoing investor funds.

In order to cover his shortfall or debt, Bentley engaged in a Ponzi scheme whereby he had to attract new money to satisfy the repayment of CDs purchased with old money. *Id.* at 357:13-16. Until caught, he was able to do this through a number of artifices. Among other things, Bentley represented to his investors that they were purchasing CDs for a fixed term at some interest rate and that they were purchasing FDIC certificates. *Id.* at 103:01, 132:01, 358:21. Many of Bentley's investors were small institutions that would not agree to long-term investments. *Id.* at 133:21. Bentley described how the commingling of money from investors was used in furtherance of his Ponzi scheme to purchase CDs to fund the operations of BFS to satisfy obligations of other investors and to compensate him personally. *Id.* at 131:08-20. For instance, a credit union would purchase a

CD from a bank believing it was for a one-year increment, when the CD's maturity date actually may have been 10 years out.[19] *Id.* at 132:01-05. The CD however was callable, meaning that the issuing bank could terminate the CD well before the planned maturity date. *Id.* at 132:01, 132:05. If the CD was called after six months, the money would sit in Entrust's wire account, which Bentley controlled, for another six months until its maturity date. *Id.* at 132:06-11. Once CDs were called, Bentley was under an obligation to immediately repay the principal and interest on those CDs through the termination date to his investors. *Id.* at 133:11-14. He did not do so because he would have had to disclose that the CDs he purchased were callable, a type of investment that many of his investors were not willing to accept given the interest rate risk attendant to them. *Id.* at 133:17-24. During the time in which a CD would have matured, Bentley would have 10, 20, 30, or 40 other institutions that also had CDs called. *Id.* at 132:12-15. Money in the account would then quickly grow to two, three, or four million dollars. *Id.* During that time, other credit unions were purchasing CDs and other CDs were coming to maturity on a daily basis. *Id.* at 132:19-24. Bentley was able to hide the true status of investor funds because the funds were maintained in the commingled account. *Id.* at 133:01-06. As long as the interest rate offered by Bentley was attractive, Bentley was able to attract new investors or, in

---

[19] Longer term CDs would pay higher interest rates.

other words, new money, to pay off old ones. *Id.* at 358:04-07. As described by Bentley, it was more of a numbers game, making sure he had a large pool or a larger pool of investors that were looking at rates because each institution's cash position may be different. *Id.* at 358:08-11. One way Bentley was able to attract a larger pool of investors to raise additional funds was by increasing interest rates being offered. *Id.* at 358:17-21.

Bentley also engaged in what he described as mismatching CDs. For example, if there were 11 months remaining on a CD and a potential customer wanted a 12-month CD, he would mismatch the maturity dates on CDs and issue a customer a receipt that said 12 months when in fact it was only going to earn 11 months' interest. *Id.* at 23:21. This created a situation where cash flows from assets and liabilities would not align. Moreover, the changing of maturity dates and the failure to disclose that practice was illegal because in doing so, Bentley was deemed to have created investment certificates. *Id.* at 56:01.

Appellant alleged that due to Bentley's illegal Ponzi scheme, investors suffered damages of approximately $20 million for the period June 1996 through October 2001. In defense, BMT presented the expert testimony of Paul W. Pocalyko, an individual certified in public accounting, fraud examination, and financial forensics. In an initial expert report dated July 27, 2012, Pocalyko set forth his understanding of the receivership as follows. On October 24, 2001, the receivership took possession of approximately $328.4

million in CDs. Defendant's Trial Exhibit Exhibit 100, Expert Report of Paul W. Pocalyko, at 16. The portfolio had a weighted average interest rate of 5.33% and varying maturity dates through August 2018. *Id.* The receiver allowed claims totaling approximately $369.9 million, which included investment principal, accrued prior to the receivership, and vendor claims. *Id.* at 5. On April 22, 2003, the receiver made the first distribution to allowed claimants totaling $220.5 million. *Id.* at 16. To fund that distribution, as well as future ones, the receiver liquidated an unknown quantity of CDs prior to their final maturity dates, forfeiting future interest income and at times incurring early redemption penalties and fees. *Id.* It was Pocalyko's opinion that the receiver's early redemption of CDs was to the detriment of allowed claimants and severely impacted the receivership's ability to recover sums in order to satisfy the obligations of BFS. *Id.* He further opined that if the receiver held CDs to maturity through October 31, 2003, the receivership would have had funds necessary to satisfy 100% of allowed claims, and if the CDs were held to maturity through June 30, 2004, the receivership would have had funds necessary to pay 100% of allowed claims plus post-receivership interest.[20] *Id.* at 18. Pocalyko's initial report estimated administrative expenses at $50,000 per month but did not account for attorney fees. *Id.* at 16-17.

---

[20] We note that not all CDs matured by June 30, 2004, as some were not due to mature until 2018. *See* Expert Report, Paul Pocalyko, CPA/CFF, CFE, MBA, 7/27/12, Defense Exhibit 100 at 16.

Pocalyko authored a supplemental report dated August 21, 2015, based upon additional documentation provided by the receiver. Defendant's Exhibit 101, Supplemental Expert Report of Paul W. Pocalyko, at 6. In particular, the supplemental report revised its estimate of administrative expenses of $50,000 per month to approximately $300,000 per month from October 2001 through August 2003, for professional services to include attorneys' fees, accounting services, receiver compensation and consulting. *Id.* at 7. Receivership administrative and operating costs were calculated at approximately $24,000 per month for items such as temporary help, rent, and insurance. *Id.* The supplemental report also considered the receivership's tax liability on income earned on CDs and cash balances at the rates of 39.1% in 2001 to 35% in 2006 and beyond, noting that for the year ending 2013, the effective income tax rate increased to 39.6%. *Id.* at 8-9. Early redemption penalties actually paid by the receiver net of refunds and credits were considered and calculated at $209,519. *Id.* at 9-10. Finally, the supplemental report assumed a 1.5% annual interest rate on cash accounts held by the receiver, compounded monthly. *Id.* at 10. Based upon these revised considerations, Pocalyko opined that but for the receiver's decision to liquidate CDs prematurely, the receivership would have had funds necessary to pay 100% of allowed claims in the first quarter of 2007. *Id.* at 11.

BMT's alternative mitigation strategy, in simple terms, does nothing more than deprive investors of the time value of their money after the allowed

claim date to provide them the full amount of their claims as of the claim date. In effect, BMT's mitigation strategy is dependent upon the receiver keeping investor's money longer in order to pay investors back their allowed claims with the income earned on their money. This alternative strategy does not demonstrate a failure to reasonably mitigate damages by Appellant. It is a strategy that would have paid investors 100% of their allowed claims with income earned on their own money, investments each of them could have made when paid their allowed claims.

More importantly, BMT's mitigation strategy was dependent upon continuing some of the same wrongful actions committed by Bentley. One of the principal illegalities in Bentley's Ponzi scheme was the holding of investor funds past the maturity date of their CDs when investor funds were to be returned immediately upon the maturity of those instruments. BMT's alternative mitigation strategy proposed precisely the same extended withholding of investor funds that was not agreeable to investors when BFS brokered and purchased the CDs. Much of BMT's proposed mitigation strategy required that the receiver continue to withhold from investors the funds from matured CDs in order to accrue additional income in an interest-bearing account.

Another key component of Bentley's Ponzi scheme involved the sale of "privately-issued, unregistered BFS notes and obligations" and "unregistered investment contracts," which BFS investors "were led to believe were bank-

issued, FDIC-insured" CDs or direct interests therein. BMT Motion for Summary Judgment, 9/21/12, at Exhibit A; Plaintiff's Trial Exhibit 141, Testimony of Robert Bentley, 3/12/18, at 120:11 to 138:18. BMT's mitigation strategy does not address holding these unacceptable investments, but as stated, advocates that the receiver should have held CDs to maturity, which as stated by Bentley, was longer than was acceptable to investors. Admittedly, the district court in its November 1, 2001 order *authorized* the receiver to maintain unmatured CDs placed by Bentley in financial institutions until maturity. This authorization, however, was given with the caveat that the receiver shall have no liability for allowing such CDs to remain in those institutions chosen by the Bentley defendants. We do not interpret this portion of the order, as BMT improperly argued numerous times throughout trial (N.T. Trial, 3/14/18, at 161-62; N.T. Trial, 3/15/18, at 198), that the receiver was *obligated* to maintain those CDs in those institutions to maturity. Rather, we interpret this portion of the order only as a recognition that the receiver was to take charge of tainted assets and that he would incur no liability for not disturbing the placement of those CDs immediately until he could reasonably act to remedy the situation.

Appellant responded to pressure from Bentley's investors, as well as the SEC, the FDIC, and the Federal Reserve, to recover as much money as possible and as quickly as possible because many investors were in serious financial distress. To this end, Appellant, as receiver, embarked upon an early

liquidation of CD strategy that the district court approved. Investors were paid 92% of their allowed claims. BMT presented a tainted mitigation defense by advocating some of the same wrongful strategies engaged in by Bentley during the perpetuation of his Ponzi scheme. BMT's further attempt to demonstrate that 100% mitigation of damages to investors was possible proposed nothing more than to pay allowed claims with money earned on investors' own money. In our opinion, this did not demonstrate a failure on the part of the receiver to reasonably mitigate damages. To be clear, we do not hold as a general proposition, that a defendant may not challenge a receiver's actions in response to a receiver suit. We hold only that under the facts of this case, BMT's mitigation defense, as that pertains to the early liquidation of CDs, did not demonstrate a failure to act reasonably on the part of the receiver. Therefore, it was error for the trial court to permit BMT to assert its alternative mitigation strategy to the damages claimed by the receiver. Doing so constituted an abuse of discretion by the trial court thereby entitling Appellant to a new trial on this basis as well.

## III. Conclusion

In summary, we have concluded that the trial court erred in granting summary judgment on Appellant's § 876(b) "aiding and abetting fraud" claim. Pennsylvania recognizes a claim under § 876(b) regardless of whether the claimant titles it "concerted tortious action" or "aiding and abetting fraud." The trial court further committed prejudicial error in permitting BMT to

introduce evidence of the attorneys' fees Appellant incurred throughout his receivership, and in permitting BMT to assert its mitigation defense strategy regarding the early liquidation and redemption of investor CDs. These errors were not harmless and permeated both the liability and damages phase of the trial. We conclude that these combined errors constitute an abuse of discretion by the trial court not to grant Appellant a new trial. Based on all of the foregoing, we vacate the judgment and remand for a new trial, which shall include Appellant's § 876(b) cause of action.

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/16/21