# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Environmental     :
Protection,     :
                Petitioner     :
    :
                v.     :    No. 291 C.D. 2020
    :    Argued: April 12, 2021
B&R Resources, LLC and     :
Richard F. Campola,     :
              Respondents     :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge (P.)
                 HONORABLE ANNE E. COVEY, Judge


<u>OPINION NOT REPORTED</u>

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**           **FILED: December 6, 2021**

Section 3220(a) of the Act of February 14, 2012, P.L. 87 (2012 Oil and Gas Act), requires an owner or operator of an abandoned gas well[1] to plug the well "to stop [the] vertical flow of fluids within the well bore." 58 Pa.C.S. §3220(a). Aware of this obligation since December 2011 and after stipulating as to this obligation in 2016, B&R Resources, LLC (B&R) and its sole director and managing member, Richard F. Campola (Campola) (together, Respondents), took no action on numerous notices of violation issued by the Department of Environmental Protection

---

[1] An abandoned well is one "that has not been used to produce, extract or inject any gas, petroleum or other liquid within the preceding 12 months," where the "equipment necessary for production, extraction or injection has been removed," or "considered dry and not equipped for production within 60 days after drilling, redrilling or deepening" but does not include a well that is granted inactive status. Section 3203 of the 2012 Oil and Gas Act, 58 Pa.C.S. § 3203.

(DEP), requesting that B&R plug its abandoned wells (Wells). The Environmental Hearing Board (EHB) ultimately found Campola personally liable for plugging all the Wells, and in *B&R Resources, LLC v. Department of Environmental Protection*, 180 A.3d 812 (Pa. Cmwlth. 2018) (*B&R I*), this Court affirmed the determination that Campola could be held personally liable but vacated and remanded for a new determination on how many of the 47 Wells could have been plugged had Campola "caused B&R to make reasonable efforts to plug the Wells." *Id.* at 822. Upon remand, after a hearing and a review of evidence of B&R's financial resources, the EHB answered this question in its February 14, 2020 Adjudication (2020 Adjudication), concluding Campola was personally liable for plugging 4 of the 47 Wells. DEP now petitions for review, arguing that the EHB did not properly apply the standard set forth in *B&R I* when it limited Campola's personal liability to only four violations, did not issue factual findings that are supported by substantial evidence, and did not comply with its obligations under article I, section 27 of the Pennsylvania Constitution, PA. CONST. art. I, § 27[2] (Environmental Rights Amendment or ERA).[3]

---

[2] Article I, section 27 of the Pennsylvania Constitution provides:

> [t]he people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27.

[3] We have reordered the arguments for ease of discussion.

## I. Background

### A. *Facts*

Campola purchased B&R in 2011 and makes all operational decisions. *B&R I*, 180 A.3d at 814-15. Between December 2011 and June 2015, DEP advised Campola that numerous B&R wells, including the 47 Wells at issue, were abandoned and had to be plugged. *Id.* at 814. DEP also asked Campola, at least once, for a well-plugging schedule in accordance with 25 Pa. Code § 78.91(a),[4] which would bring the Wells into compliance. Campola did not provide any schedule, and B&R did not plug the Wells or return them to production. DEP issued an Administrative Order on June 22, 2015, finding that the Wells were abandoned, as owner/operator B&R had to plug the Wells, and Campola was also liable for plugging the Wells because he had "personally participated" in B&R's failure to plug the Wells. *Id.* Respondents appealed the Administrative Order to the EHB.

### B. *The EHB's 2017 Adjudication*

---

[4] This regulation states that

[u]pon abandoning a well, the owner or operator shall plug the well . . . unless one of the following applies:

(1) [DEP] has granted inactive status . . . .
(2) The well is part of a plugging schedule that has been approved by [DEP] and the operator is complying with the schedule, and the schedule takes into account potential harm that the well poses to the environment or public health and safety.
(3) [DEP] has approved the identification of the well as an orphan well . . . and . . . has not determined a prior owner or operator received economic benefit after April 18, 1979, from this well other than economic benefit derived only as a landowner or from a royalty interest.

25 Pa. Code § 78.91(a).

3

Prior to an evidentiary hearing, the parties stipulated that the Wells were abandoned, B&R was required to plug the Wells, and B&R had not done so. The only remaining issue for the EHB to address, therefore, was whether Campola was personally liable. At the evidentiary hearing, "Campola testified that he made a business decision that B&R would spend its funds on its producing wells, on bringing wells into production, and on other expenses, and that it would **not spend any funds** to plug any of the Wells." *B&R I*, 180 A.3d at 816 (emphasis added). Also introduced was a letter from Campola to DEP, wherein Campola stated that B&R was being singled out, asked that B&R be allowed to fix the problems without DEP's interference, "blam[ed] landowners, the laws of Pennsylvania and 'sketchy records' at [DEP] for being [why B&R was] unable to turn on more wells," and indicated that "'as to the violations, B&R [was] not in any position to plug wells at th[at] time'" and that "B&R's 'intent was never to plug the [W]ells, but to produce them.'" (2017 Adjudication at 15-16 (quoting DEP Ex. K, Reproduced Record (R.R.) at 293a).) Respondents argued that Campola could not be liable under the participation theory of liability, which can be used to impose personal liability on individual officers of limited liability companies for violations of environmental statutes based on their personal actions, because B&R did not have the financial resources to plug the Wells. *B&R I*, 180 A.3d at 818-22; *Kaites v. Dep't of Env't Res.*, 529 A.2d 1148, 1152 (Pa. Cmwlth. 1987); (R.R. at 54a-56a, 78a-84a, 124a-25a).

The EHB issued its 2017 Adjudication, finding Campola personally liable for B&R's failure to plug all 47 of the Wells and dismissing Respondents' appeal. The EHB observed that "Campola's letter makes clear that he understood that failing to plug the [W]ells was a violation, that he had no plans to plug any [W]ells, and that

4

he wanted to resolve the matters without the involvement of [DEP]." (2017 Adjudication at 16.) According to the EHB, however, notwithstanding Campola's request that B&R be able "to fix the problems without [DEP] interference," "there was no evidence presented that [] Campola fixed any of the problems or plugged a single . . . Well," which "support[ed] a finding that [] Campola intentionally neglected to deal with the violations . . . ." (*Id.* at 18-19.) The EHB further rejected the argument that Campola could not be held liable based on B&R's lack of financial resources, explaining that "[w]hile B&R [] had some financial difficulties, it also had some financial resources that . . . Campola decided to spend for other purposes rather than [to] correct the violations . . . ." (*Id.* at 20-21.) Finally, the EHB held that, as sole member and managing member of B&R, Campola made all operational decisions for B&R, including how to spend B&R's funds, and had the authority and duty to address the violations but took no action to do so. Respondents appealed the 2017 Adjudication to this Court.

### C. B&R I

On appeal, Respondents argued that Campola could not be individually liable because his only involvement in B&R's failure to plug the Wells was his inaction, and the EHB erred in relying on his role as sole member and manager to impose liability. Respondents further argued that, to the extent Campola could be liable, that liability had to "be limited to the number of wells that B&R could have plugged if its resources had been used to plug the Wells." *B&R I*, 180 A.3d at 817. This Court rejected the first two arguments[5] but found merit in the third because a limited

---

[5] The Court held that a corporate officer's intentional and knowing refusal to take action can give rise to personal liability under the participation theory, which is what occurred when Campola did not act on B & R's obligation to plug the Wells despite knowing of that obligation. **(Footnote continued on next page…)**

5

liability company officer could be "liable for a statutory violation under the participation theory only if there is a causal connection between [the officer's] wrongful conduct and the violation." *Id.* Applying this standard to this situation, we explained:

> Because Campola is individually liable only for those violations to which his conduct contributed, he can therefore be liable only for those wells that B&R could have plugged if he had undertaken to bring B&R into compliance with DEP's directives.
>
> The EHB did not find that there was any possibility that B&R could have plugged all 47 of the Wells or even a high percentage of the Wells. The EHB held only that B&R had "<u>some</u> financial resources that . . . Campola decided to spend for other purposes rather than correct the violations." . . . Because there was no showing or finding that Campola's decision that B&R would not plug the Wells contributed to the failure to plug all 47 Wells, the EHB's ruling that Campola is liable for all 47 cannot stand.
>
> **The EHB did not make any finding as to how many of the Wells B&R could have plugged, if any, nor did it make sufficient factual findings from which such a determination can be made.** . . . Remand to the EHB is therefore required for the EHB to adjudicate the extent of Campola's liability, if any.
>
> Accordingly, we reverse the EHB's dismissal of Campola's appeal and its holding that Campola is liable for B&R's statutory obligation to plug all 47 of the Wells. Because the EHB's findings are insufficient, **we remand this matter to the EHB for additional findings of fact as to how many, if any, of the Wells could have been plugged if Campola had caused B&R to make reasonable efforts to plug the Wells and for an adjudication of Campola's liability in accordance with those findings.**

---

Second, we explained the EHB had not relied on Campola's status as owner and manager, but on its factual findings "that [Campola] knew of B & R's obligation to plug the Wells," made the decision that B & R would not plug the Wells, and "had B & R spend its financial resources for purposes other than complying with DEP's directions . . . ." *B & R I*, 180 A.3d. at 821.

*Id.* at 821-22 (bold emphasis added).

### D. The EHB's 2020 Adjudication

On remand, the parties offered differing interpretations of the scope of the Court's remand instructions, neither of which the EHB accepted. According to the EHB, the Court's instructions did not allow it, as DEP argued, to make decisions based on hypotheticals, such as entering into a plugging schedule or purchasing a pipeline,[6] or to find that most, if not all, of B&R's income should have been used to plug the Wells. Those instructions, the EHB held, also did not allow it to treat the statutory obligation to plug the Wells as an "afterthought to other business requirements," and defer wholly to Campola's business judgment, as Respondents suggested. (2020 Adjudication at 11, 15.) Instead, focusing on the Court's use of the phrase "reasonable efforts," the EHB explained it had to determine "what constitutes a reasonable effort by B&R [], under [] Campola's direction, to meet its statutory obligation" given B&R's financial resources. (*Id.* at 11.) The EHB settled on a standard that considered whether the expenditures were actually made, whether the expenditures were supported by documentation, and whether the expenditures were "legitimate business expenses that B&R was **required to expend in order to remain in business**." (*Id.* at 15 (emphasis added).) The EHB then examined the evidence of B&R's financial resources and Campola's actions that was presented at

---

[6] The record shows that in 2015 the main purchaser of B & R's gas, National Fuel Gas Distribution Corporation (National Fuel), stopped operating its Q3 pipeline, which left B & R with limited or no distribution for its gas. (R.R. at 1020a-22a.) B & R discussed purchasing the Q3 pipeline with National Fuel to keep it online, which Campola testified would cost between $70,000 and $80,000, but those discussions ended when DEP issued the Administrative Order. Campola testified that there was no longer an option to purchase the line because he had to protect himself. (*Id.* at 1022a.) He explained that, given the price of gas at the time, it would not have been a good business decision to purchase the line because the expenses would have exceeded the revenues. (*Id.* at 1024a.)

7

the prior hearing and the one-day evidentiary hearing on remand to determine how many Wells B&R could have plugged had Campola's wrongful conduct not prevented B&R from doing so. (*Id.* at 12.)

The EHB incorporated its prior findings of fact from the 2017 Adjudication and made the following additional findings. The relevant time period for reviewing B&R's finances is from August 2011, when Campola purchased B&R, to June 2015, when DEP issued the Administrative Order. DEP's financial expert, David Duffus, and Respondents' financial expert, William Beaufait, reviewed B&R's finances and calculated an annual book net loss for B&R, which was determined by subtracting B&R's total deductions from its total income. (2020 Adjudication, Findings of Fact (2020 FOF) ¶¶ 5-6.) B&R's annual book net losses were: $31,495 for 2011; $39,563 for 2012; $438 for 2013; $24,628 for 2014; and $19,703 for 2015, which resulted in a total net book loss of $115,827. (*Id.* ¶¶ 7-8.) These calculations included deductions for depreciation, expenditures that DEP labeled "discretionary," and loan or other payments made by B&R. The EHB took the total net book loss and then reviewed each type of deduction to determine if any of those amounts "could have been allocated to plugging wells had [] Campola directed that the company make a reasonable effort to do so." (2020 Adjudication at 13.)

The EHB began with the depreciation that B&R had taken over the relevant time period, which was: $44,279 for 2011; $76,313 for 2012; $59,794 for 2013; $42,195 for 2014; and $21,098 for 2015, for a total of $243,679. (2020 FOF ¶¶ 9-12.) Concluding that depreciation constituted an accounting measure and not actual cash expenditures, the EHB held that the depreciation of $243,679 should be added back into B&R's finances. When this was done, instead of a net book loss of

8

$115,827, there was no loss and an adjusted gain of $127,852. (2020 Adjudication at 15.)

The EHB next examined B&R's discretionary expenditures. Between August 2011 and June 2015, B&R paid $124,526 for pumper fees, $57,941 for line repairs, $50,151 in legal fees, and $36,273 in catch-all expenses. (2020 FOF ¶ 13.) DEP argued the discretionary expenditures should be added back into B&R's financial resources. Campola and Beaufait testified these expenditures were normal, legitimate business expenditures that should not be added back into B&R's financial resources. While they described the pumper fees, line repair fees, and legal fees to avoid a default judgment as being necessary to continue to operate B&R, other expenses were generally described as being "business-related," "ordinary, normal," or "helpful" to B&R's operation. (R.R. at 54a-56a, 78a-84a, 124a-25a, 1008a-13a, 1020a-21a, 1099a-1100a, 1109a-10a, 1115a-18a, 1120a, 1123a-24a, 1129a, 3368a.)

Applying its standard that considered whether these were "legitimate business expenses that B&R was required to expend in order to remain in business," (2020 Adjudication at 15), the EHB held that the pumper fees, which are paid to someone to maintain and service the wells,[7] and the line repair costs were necessary. It reasoned that without the pumper's services, B&R could not have continued to produce the wells and generate income, and the line repairs were needed to prevent gas leaks, which would result in less detriment to the environment and more gas to sell. The EHB concluded that the legal fees were incurred because B&R "was involved in litigation arising out of disputes with several of its lease holders and

---

[7] Campola's son acted as a pumper for B & R for part of the relevant time period, and, therefore, some of the $124,526 was paid to him. The EHB found that the amount of pumper fees paid during the relevant time period "were genuinely consistent with the fees paid by B & R . . . prior to . . . Campola's ownership of the company." (2020 FOF ¶¶ 14-15.)

royalty owners." (2020 FOF ¶ 17.) It held that "[g]iven the nature of the disputes, the evidence [did] not convince [the EHB] that B &R [] had much choice but to legally defend its interests," it was reasonable to hire counsel to help, and there was no evidence that the amounts charged were unreasonable. (2020 Adjudication at 16.) As for the catch-all expenses, which included items like office supplies, travel, professional dues, and meals and entertainment, the EHB found they "were minimal and in line with the amount and type of expenses incurred by a typical independent oil and gas well company." (2020 FOF ¶ 18.) Accordingly, the EHB concluded that the discretionary expenditures were "legitimate business expenses that B&R [] was required to expend to remain in business" and would not be added back. (2020 Adjudication at 15-16.)

The EHB next reviewed B&R's loans and loan payments, as well as transactions between B&R and Campola personally. B&R was liable to repay loans to Cortland Bank, related to the purchase of equipment and evidenced by executed loan documents, and to Kurt Latell, which was evidenced by a promissory note. (2020 FOF ¶¶ 19-21, 24.) B&R paid $38,691 to Cortland Bank and $37,759 to Latell between August 2011 and June 2015. (*Id.* ¶¶ 23, 26.) Campola personally received funds in the amount of $23,020 and $10,856 from B&R in 2014 and 2015, respectively, but there were no promissory notes or loan documents related to these funds. (*Id.* ¶ 27.) Per the record, B&R received what appears to have been a loan of $28,000 in 2011 from Select Energy, another company closely held by Campola, which B&R repaid in 2013, for which there were no documents. (R.R. at 913a-14a, 946a-47a, 950a, 952a, 1066a-67a.) The record also shows that B&R borrowed more than $210,000 in no-interest loans from Campola personally to pay the legal expenses incurred in defending against the Administrative Order between September

10

2016 and August 2019, which were memorialized by loan agreements pledging B&R's equipment to Campola and providing no time limit for repayment. (*Id.* at 1466a-86a, 3318a-44a.) Campola testified that this was a good business decision because B&R could deduct the legal expenses, B&R had an obligation to protect Campola, and he had to protect himself. (*Id.* at 1043a, 1045a-46a.)

The EHB found that B&R's loan payments to Cortland Bank and Latell were legitimate expenses, supported by loan agreements, which B&R could not have ignored without consequences. Therefore, those amounts would not be added back into B&R's financial resources. In contrast, the EHB found that the money Campola received from B&R should be added because there were no loan agreements supporting the assertion that these were standard business loans. (2020 Adjudication at 17.) It reasoned that when B&R should have been complying with its statutory obligations, Campola's decision to take company funds "for his personal use was wrongful conduct and did not constitute a reasonable effort to meet its obligations." (*Id.*) The EHB did not address the $28,000 transaction with Select Energy or DEP's assertion that B&R's ability to borrow money, as demonstrated by the loans it received from Campola to litigate this matter, should have been included in determining B&R's financial resources.

Based on the EHB's review of B&R's financial resources and transactions, the EHB held that B&R had $85,278[8] in funds available to plug the Wells, which "Campola wrongfully directed away from [B&R complying with its] statutory obligations." (*Id.* at 18.) Dividing that amount by $18,500, which the parties

---

[8] This number is derived from adding the $23,020 and $10,856 in funds Campola received from B & R to the $127,852 adjusted gain after B & R's depreciation was added back, and subtracting $76,450, the amount B & R repaid in loans to Cortland Bank and Latell, from that amount. Thus, $127,952 + $23,020 + $10,856 - $76,450 = $85,278.

11

stipulated was the average cost to plug a well, the EHB found that Campola personally prevented B&R from plugging four of the Wells and that he would be personally liable for those Wells. Accordingly, the EHB dismissed Campola's appeal as to those Wells and granted the appeal as to the remaining 43 Wells identified in the 2015 Administrative Order. DEP thereafter filed a petition for reconsideration based on the EHB's failure to consider the $28,000 B&R received and then returned to Select Energy. The EHB held that it did not fail to consider those funds but considered and determined that no adjustment was warranted because it was essentially a "wash" for both companies. (R.R. at 3452a-53a.) DEP now petitions this Court for review.[9]

---

[9] "This Court's review of the EHB's adjudication is limited to determining whether the EHB violated constitutional rights or committed errors of law, or whether any necessary findings of fact are not supported by substantial evidence." *B & R I*, 180 A.3d at 817 n.2. Issues of law are subject to this Court's plenary, de novo review. *Id.* The "[r]esolution of conflicts in the evidence and questions of witness credibility and evidentiary weight are within the EHB's exclusive discretion," and "in determining whether substantial evidence exists, [this Court must] view the record in the light most favorable to the party that prevailed before the EHB, and give that party the benefit of all reasonable inferences that can be drawn from the evidence." *Id.* Substantial evidence is such "relevant evidence upon which a reasonable mind could base a conclusion." *MKP Enters., Inc. v. Underground Storage Tank Indemnification Bd.*, 39 A.3d 570, 579 (Pa. Cmwlth. 2012).

12

## II. Discussion

There is no dispute that the Wells are abandoned, that B&R has the statutory obligation to plug those Wells, and that, after *B&R I*, Campola can be held personally liable to the extent that his wrongful conduct caused B&R's failure to comply with its statutory obligations. The issues before the Court are whether: the EHB exceeded the scope of *B&R I*'s remand instructions by reviewing Campola's expenditures of B&R's resources or revising its prior disposition of Campola's appeal; the EHB erred in applying the legal standard set forth in *B&R I* by holding that only 4 of the 47 Wells could have been plugged had Campola caused B&R to make reasonable efforts to comply with the statutory mandate that abandoned wells must be plugged; the EHB violated the ERA; and, if any of the above occurred, a remand is required. We address these issues in turn.

### A. *Whether the EHB Exceeded the Scope of B&R I's Remand Instructions*

DEP first argues that the EHB did not comply with this Court's remand instructions when it reconsidered whether Campola's conduct in directing funds to pay for things other than plugging the Wells was wrongful, despite the EHB having already made that determination in the 2017 Adjudication, which was upheld in *B&R I*. Such redetermination, DEP maintains, violates the law of the case doctrine. Respondents reply that because *B&R I* required a causal link between Campola's conduct and B&R's failure to plug the Wells, a redetermination as to the nature of Campola's conduct was necessarily required. Therefore, Respondents assert the EHB did not exceed the Court's remand directive.

Pursuant to Pennsylvania Rule of Appellate Procedure 2591(a), upon remand by an appellate court, a governmental unit "shall proceed in accordance with the judgment or other order of the appellate court . . . ." Pa.R.A.P. 2591(a). "[I]t has

13

long been the law in Pennsylvania that following remand, [an administrative agency] is permitted to proceed only in accordance with the remand order." *Commonwealth v. Sepulveda*, 144 A.3d 1270, 1280 n.19 (Pa. 2016). "Where a case is remanded for a specific and limited purpose, issues not encompassed within the remand order may not be decided on remand." *Levy v. Senate of Pa.*, 94 A.3d 436, 442 (Pa. Cmwlth. 2014) (internal quotation and citation omitted).

There can be no dispute that B&R's conduct was wrongful and violated the 2012 Oil and Gas Act and that it is liable for those violations and that Campola, who made the decisions regarding how B&R expended its funds, likewise engaged in wrongful conduct by actively avoiding and resisting B&R's known legal obligations to plug the Wells. The EHB made this determination in 2017, which was upheld in *B&R I*, and it is Campola's wrongful conduct that exposes him to personal liability under the participation theory. *B&R I*, 180 A.3d at 821-22. Evidence of Campola's refusal to ensure B&R's compliance with Section 3220(a) is found in his own testimony that B&R "would spend its funds on its producing wells, on bringing wells into production, and on other expenses" and "would **not spend any funds** to plug **any** of the Wells." *Id.* at 816 (emphasis added) (citing Nov. 9, 2016, Hr'g Tr. at 52-54, 70-71, 101-06, R.R. at 77a-79a, 95a-96a, 126a-31a). Additional evidence is found in Campola's letter to DEP, in which Campola made clear that B&R was not intending to plug any Wells because it wanted to produce them, (R.R. at 293a), as well as in the lack of evidence showing any effort by B&R to resolve any of the violations, despite Campola's request that he be allowed to do so without DEP's interference, (2017 Adjudication at 18-19).

In *B&R I*, this Court remanded the matter for the EHB to make "findings of fact as to how many, if any, of the Wells could have been plugged if Campola had

14

caused B&R to make reasonable efforts to plug the Wells and for an adjudication of Campola's liability in accordance with those findings." 180 A.3d at 822. While these instructions did not call for the EHB to re-review Campola's conduct to determine if it remained wrongful, they necessarily required the EHB to review and evaluate Campola's expenditures of B&R's funds to determine the number of Wells for which Campola would be personally liable based on his decisions to spend B&R's funds elsewhere. Accordingly, the EHB did not violate the law of the case or exceed this Court's remand instructions when it reviewed Campola's expenditures to determine if he would be personally liable for plugging any of the Wells. Further, to the extent DEP argues it was error for the EHB to change its disposition regarding Campola's individual appeal by now denying it as to four Wells and granting it for the remaining Wells, this change was consistent with the Court's directive and the EHB's liability determination that B&R could have plugged 4 Wells had Campola caused it to make reasonable efforts.

We now turn to DEP's arguments that the EHB erred in interpreting and applying the standard set forth in *B&R I* in finding Campola personally liable for plugging only four of the Wells.

### B. Whether the EHB Applied the Proper Standard in Determining B&R's Financial Condition

DEP argues that while *B&R I* directed the EHB to make findings regarding B&R's financial ability to plug the Wells, the opinion was silent as to what standard should apply. DEP asserts that the standard the EHB should have applied was the corporate financial inability standard as described in *CST, Inc. v. Mark*, 520 A.2d 469, 472 (Pa. Super. 1987). To meet this standard, DEP argues, the officer must establish that "the corporation is unable to avail itself of a business opportunity" by showing that the corporation's "financial inability [] amount[ed] to insolvency to the

15

point where the corporation is practically defunct." *Id.* at 471-72 (citation omitted). Using this standard, DEP argues, encourages companies to work with DEP to resolve statutory violations and encourages corporate officers to make reasonable efforts in order to avoid personal liability. DEP asserts that, when this standard is applied here, Respondents did not prove that B&R was actually insolvent and, therefore, financially unable to plug the Wells.

Alternatively, DEP argues that the standard the EHB applied, which did not add back any funds used for allegedly legitimate business expenses, guts the participation theory because it allows a corporate officer to avoid liability simply by showing that the expenses directed to be paid in lieu of complying with the corporation's statutory obligation were reasonable and typical. Under the EHB's standard, DEP asserts, expenses like business lunches or a new car take precedence over statutory compliance without the ability to obtain recourse from the officer who made that decision. Such a standard would enable a corporate officer, as Campola testified here, to decide not to spend funds on remedying statutory violations, but to spend funds only on the business and still avoid personal liability.

Respondents argue the actual insolvency standard is inconsistent with the Court's instructions on remand, which required only reasonable efforts on the part of Campola and B&R.[10] According to Respondents, *CST* is distinguishable, has never been used in an environmental matter, should not be used here, and, therefore, there was no error in the EHB not applying it here. Respondents further assert that

---

[10] Respondents argue that DEP did not raise the "actual insolvency" standard before the EHB and, therefore, that argument is not preserved for appellate consideration. As DEP points out in its reply brief, it asserted this standard for measuring B & R's financial inability in various briefs filed on remand. (R.R. at 467a-71a, 586a, 600a.) Therefore, we will not find this issue waived.

the EHB's decision and standard is otherwise consistent with *B&R I*, which required only reasonable efforts.

We agree with Respondents that the EHB did not err in not applying *CST* here. *CST* involved whether a corporation's vice president breached his duty of loyalty to the corporation by taking a business opportunity for himself. 520 A.2d 469-70. The vice president argued there was no breach because the corporation was financially unable to avail itself of the opportunity and, due to that financial inability, he properly could accept the opportunity for himself. *Id.* at 472. The Superior Court rejected this argument, holding that while "financial inability of a corporation to take advantage of a corporate opportunity is a defense for corporate officers . . . charged with liability for taking an opportunity," this "financial inability must amount to insolvency to the point where the corporation is practically defunct." *Id.* (quoting 18B Am. Jur. 2d *Corporations* § 1790 (1985)). Because the vice president had not proven that the corporation was insolvent, the Superior Court affirmed the finding that the vice president had seized a corporate opportunity from the corporation. *Id.* DEP asserts the EHB should have applied this strict standard because it would encourage corporate decision makers to work with DEP to resolve the issues and/or make those individuals take reasonable steps to resolve the violation in order to avoid individual liability. However, DEP has not cited, and this Court has not found, any cases that have applied this standard outside the narrow legal issue involved in *CST*. Accordingly, we cannot say the EHB erred by not extending *CST*'s standard to this legal situation, given the Court's remand instructions in *B&R I*.

It is apparent from our decision in *B&R I* that the Court did not intend the application of a standard like that used in *CST* for determining Campola's liability. In finding merit in Respondents' arguments in *B&R I* that Campola could not be

17

liable to plug Wells that B&R did not have the financial resources to plug, we explained that Campola's decisions not to have B&R plug the Wells and to use its financial resources for other purposes would "only have a causal effect if B&R had an ability to plug those Wells." *B&R I*, 180 A.3d at 821. However, because the EHB had "held only that B&R had **some** financial resources that [] Campola decided to spend for other purposes rather than [to] correct the violations" and did not make findings as to how many Wells B&R could have plugged, we remanded for it to make findings "as to how many, if any, of the Wells could have been plugged if Campola had caused B&R to make **reasonable efforts** to plug the Wells." *Id.* at 822 (second emphasis added) (internal quotation marks omitted). *B&R I* thus instructed the EHB to use a standard of **reasonable efforts** on the part of Campola and B&R to determine Campola's liability. That standard did not link Campola's liability to whether B&R was insolvent and incapable of plugging any of the Wells, but to the reasonable efforts that could have been taken given B&R's finances. Based on the standard established in *B&R I*, there was no error in the EHB not applying the standard in *CST*.

DEP also argues that the legitimate business expense standard the EHB utilized would gut the participation theory of liability which ties into DEP's next argument – that the EHB did not properly apply the reasonable efforts standard set forth in *B&R I* in finding Campola personally liable for only four Wells.

> C. *Whether the EHB Properly Applied the Reasonable Efforts Standard in Determining Campola's Liability and Made Findings of Fact in Support of its Determination that were Supported by Substantial Evidence*

DEP argues that the EHB erred in applying the reasonable efforts standard as described in *B&R I* because the EHB should have considered all of the reasonable efforts available to B&R, which included: entering into a well-plugging schedule,

18

which had been offered to B&R and would have been a reasonable effort under *Kaites*, 529 A.2d 1148; not spending all of its funds on discretionary expenses that did not address the violations; or using its considerable ability to borrow money from Campola to meet its statutory obligations. At oral argument, DEP maintained that the reasonable efforts standard should require at least some attempt or effort to come into compliance and the record here shows that Campola made no attempt or effort to have B&R comply with its statutory obligations. Relatedly, DEP asserts that the EHB's findings that the discretionary expenditures were legitimate business expenses that the EHB used to determine B&R's financial ability are not supported by substantial evidence because not all of those expenses were necessary for B&R's continued operation.

Respondents argue that *B&R I*'s directive was clear and unambiguous that the EHB was required to examine B&R's actual finances and see how many Wells could be plugged if reasonable, not extraordinary or hypothetical, efforts were made. According to Respondents, the EHB properly did not consider hypothetical scenarios proposed by DEP, such as a well-plugging agreement, into which B&R would not have had the financial ability to enter. Further, Respondents assert, *Kaites* does not support DEP's arguments, the discretionary expenses paid were reasonable and necessary for B&R to continue its operations, and the decision to borrow money from Campola for this litigation was likewise reasonable and necessary and should not be considered in analyzing B&R's financial resources. As to the substantial evidence challenge, Respondents argue that the credited evidence supports the EHB's considered conclusion that B&R's financial resources would have only supported plugging four Wells.

19

*B&R I* directed the EHB to make "findings of fact as to how many, if any, of the Wells could have been plugged **if Campola had caused B&R to make reasonable efforts** to plug the Wells." 180 A.3d at 822 (emphasis added). While the Court in *B&R I* did not define what constitutes "reasonable efforts," the term has been used in case law, which guides our analysis.[11] Preliminarily, we note that "reasonable efforts" is an objective standard that evaluates one's actions "to determine whether [the person] exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Cappelli v. York Operating Co., Inc.*, 711 A.2d 481, 485 (Pa. Super. 1998) (citation omitted) (internal quotations omitted).[12] This is measured by what a reasonable person would do "under the facts and circumstances presented in a particular case." *Id.* In situations involving a statutory violation, the reasonable person standard may be tied to what "might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, **who desired to comply with the law**." PA-JICIV § 13.240, Subcommittee Note (quoting *Hayes v. Hagemeier*, 400 P.2d 945, 949 (N.M. 1963)) (emphasis added) (internal quotations omitted). While the standard is an objective one, "[i]t is sufficiently flexible . . . to take into account difference[s] between persons and their capacity to meet certain situations and the circumstances

---

[11] The term "reasonable efforts" has been used interchangeably with the term "reasonable diligence." *See, e.g.*, *Appeal of Edge*, 606 A.2d 1243, 1246-47 (Pa. Cmwlth. 1992) (holding that a party suffering a loss due to a breach of contract "has a duty to make reasonable efforts to mitigate that loss" which requires the exercise of "reasonable diligence"); *Cappelli v. York Operating Co., Inc.*, 711 A.2d 481, 485 (Pa. Super. 1998) (stating that "[r]easonable diligence is . . . a reasonable effort") (citation omitted).

[12] Although not binding on this Court, decisions of the Superior Court may be considered for their persuasive value when addressing analogous issues. *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

20

confronting them at the time in question." *Cappelli*, 711 A.2d at 485 (citation omitted) (alteration in original); *see also In Interest of C.K.*, 165 A.3d 935, 942 (Pa. Super. 2017) (recognizing that the use of the word "reasonable" to modify the word "efforts" means there are some "practical limitations to such efforts").

In determining whether a person has engaged in reasonable efforts, courts have looked at many factors, including the affirmative actions taken by the person and whether the actions resulted in harm. For example, in *C.K.*, the Superior Court found a local agency did not make reasonable efforts toward family reunification when it failed, without explanation, to identify a proper therapist and properly communicate with therapists, which resulted in months' long delays in a family receiving court-ordered therapy. 165 A.3d at 942-44. In other cases, courts have focused on the affirmative steps a person took to make themselves aware of information needed to protect their interests. For instance, in *Cappelli*, the Superior Court examined whether the plaintiffs in personal injury actions exercised reasonable diligence in discovering that the company that had investigated air quality at their workplace was negligent in doing so, thereby contributing to the progression of their illness, such that the running of the statute of limitations on their claims would be tolled pursuant to the discovery rule. The Superior Court concluded that reasonable minds could differ and, therefore, reversed the grant of summary judgment in the defendant's favor. *Cappelli*, 711 A.2d at 488. Specifically, the Superior Court found the plaintiffs sought medical advice and complained to their employer, who hired the defendant to investigate. *Id.* Even after being assured by the defendant that the air qualify was acceptable, the Superior Court noted that the plaintiffs continued to complain until the employer hired another company, which found there were contaminants in the air. *Id.* Accordingly, the Superior Court held

the issue should have gone to the jury to resolve. In contrast to *Cappelli*, the plaintiff in *Cochran v. GAF Corporation*, 666 A.2d 245, 249-50 (Pa. 1995), waited four years before taking any steps to obtain legal or medical help to ascertain the cause of his lung cancer and was found, as a matter of law, to have not exercised reasonable efforts or diligence.

Perhaps most useful in ascertaining the meaning of "reasonable efforts" are cases that involve the duty to take reasonable attempts to mitigate damages, which is essentially what *B&R I* required by framing the issue as how many Wells B&R could have plugged had Campola caused B&R to take such efforts to mitigate the statutory violations. In those cases, "[r]easonableness 'is to be determined from all the facts and circumstances of each case, and must be judged in the light of one viewing the situation at the time the problem was presented," and the fact finder's decision of reasonable efforts is entitled to deference **if it is supported by the record**. *Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 259, 261, 263 (3d Cir. 2008). There, the Third Circuit upheld the finding that plaintiffs had not reasonably mitigated their damages where the record showed that their passive allocation of the funds at issue was not comparable to their prior, more risky investment strategies. *Id.* at 261, 263.

However, actions that **continue the wrongful conduct** are **not** efforts that should be considered reasonable. *Marion v. Bryn Mawr Tr. Co.*, 253 A.3d 682, 705 (Pa. Super. 2021). In *Marion*, an investment company, which had been involved in a Ponzi scheme, challenged its receiver's efforts to mitigate damages as being unreasonable where the receiver withdrew certificates of deposit (CDs) early to pay the investment company's investors. The investment company argued that the receiver should not have liquidated the CDs prematurely, which resulted in penalties,

but held on to the CDs and delayed returning the investors' money. The Superior Court rejected this plan because "it was dependent upon continuing some of the same wrongful actions committed." *Id.*

Based on our review of the law, it appears that "reasonable efforts" requires evidence that a person took affirmative action and acted diligently in an effort to prevent harm and protect the person's interests, as well as those of others. While the person is not required to engage in "undue risk, expense, burden, or humiliation[,]" *Prusky*, 532 F.3d at 259, they must act as a reasonable person, who desires to comply with the law, would act under the particular facts and circumstances involved. Thus, the person's actions should not simply continue the same wrongful conduct. *Marion*, 253 A.3d at 705. We now turn to the application of this standard.

### 1. The Well-Plugging Schedule

DEP first maintains that the reasonable efforts that the EHB should have considered included Campola having B&R enter a well-plugging schedule with DEP. It argues that entering into such an agreement would have been like the consent agreements entered into by the corporate officer in *Kaites*, who was later found not personally liable under the participation theory. Doing so, DEP argues, would have resolved all the violations pursuant to Section 78.91(a) of its regulations, 25 Pa. Code § 78.91(a).

In *Kaites*, the corporate officer was not personally liable for environmental violations of the company under the participation theory because there was no "positive proof" of wrongful conduct or intentional neglect or misconduct by the officer where the officer had entered into consent agreements with DEP and attempted, unsuccessfully, to resolve the environmental issues. 529 A.2d at 1151-52. Certainly, as in *Kaites*, Campola entering, or negotiating, a well-plugging

23

schedule agreement with DEP, would have been a reasonable effort to plug the Wells. However, an agreement is not the only example of a reasonable effort, and the existence of an alternative mitigation strategy does not establish that the strategy used was unreasonable. *Marion*, 253 A.3d at 702. The only mention of a well-plugging schedule is a single sentence in *B&R I*'s recitation of the facts. *Id.* at 815. In conclusion, although entering into or attempting to enter into a well-plugging agreement would have been a reasonable effort, we cannot say that the EHB erred in reviewing the established financial aspects of this matter.

### 2. "Purely Discretionary" Expenditures

DEP next argues that the EHB erred by not including in its reasonable efforts determination the amounts that Campola should have directed B&R to use to remedy the violations rather than on what DEP characterizes as purely discretionary expenditures, which include the pumper fees, line repairs, legal fees, and other business expenses (catch-all expenses). Related with this argument is DEP's claim that the EHB's findings that these expenditures were legitimate business expenses, and consistent with B&R's reasonable efforts to comply with Section 3220(a), are not supported by substantial evidence where there was no evidence that those expenses were **required** to B&R's ongoing operation.

The EHB examined whether the discretionary expenses were "legitimate business expenses that B&R was **required to expend in order to remain in business**." (2020 Adjudication at 15 (emphasis added).) To the extent the EHB's standard focuses on expenses that were "**required** to [be expended] in order [for B&R] to **remain in business**," (*id.* (emphasis added)), it comports with the reasonable efforts standard. This allows the business to remain operational so it can generate funds that can then be used to meet its statutory obligations.

24

However, the reasonable efforts standard also requires evidence that the corporate officer took affirmative action and acted diligently in protecting the interests of others and that simply continuing the same wrongful conduct does not equate to reasonable efforts. *Marion*, 253 A.3d at 705. This is particularly true when there is risk of environmental harm. In such situations, the courts have recognized that even businesses in financial trouble have an obligation to comply with environmental laws. *In re Jager*, 609 B.R. 156, 161 (Bankr. W.D. Pa. 2019) (stating "environmental obligations imposed by law must be complied with, and a debtor may not evade or avoid environmental compliance"); *see also Penn Terra Ltd. v. Dep't of Env't Res.*, 733 F.2d 267, 277-78 (3d Cir. 1984) (holding Pennsylvania could enforce state environmental laws against a business so as to prevent future harm, notwithstanding the existence of an automatic stay due to the business having filed a bankruptcy petition). A statutory obligation cannot be ignored in favor of a business's use of its finances for purposes other than remaining in business. Allowing otherwise or applying this standard to give deference to all of a corporate officer's decision-making would swallow the participation theory of liability and/or sanction a decision to increase profits to the detriment of the business's legal obligations. It would be analogous to accepting the investment company's argument in *Marion* that the receiver had to continue the unlawful actions in order to have made reasonable efforts, which does not comport with a standard that is based on what a reasonable person, who desires to comply with the law, would do. Thus, there must be evidence to support the finding that the expenditures were actually **required** for B&R to remain in business and not simply a continuation of the wrongful conduct. *Marion*, 253 A.3d at 705.

With these principles in mind, we turn to the EHB's findings regarding particular discretionary expenditures and whether those findings are supported by substantial evidence.

The EHB found that the expenditures on pumper fees and line repair fees met this standard and, therefore, excluded them from its calculation of B&R's available finances. These findings are supported by substantial evidence. Campola testified the pumper fees were necessary because the pumper is responsible for checking the wells to determine if they are leaking, repairing the wells, and charting the wells' production, and, without this work, the wells' compressors would stop working and B&R would be without natural gas to sell. (R.R. at 988a-91a; 2020 FOF ¶¶ 14-15.) He explained that, without a pumper, B&R would have been unable to generate revenue. (R.R. at 991a.) Campola also testified that line repair costs were incurred to prevent the loss of natural gas to the environment and ensure that the produced gas could be sold. (R.R. at 1007a-08a; 2020 FOF ¶ 16.) Such testimony constitutes substantial evidence that supports the EHB's findings that these expenses were legitimate and were "**required to [be expended] in order [for B&R] to remain in business**," (2020 Adjudication at 15 (emphasis added)), and, as such, should not be added back into B&R's finances.

As for B&R's legal expenses, the EHB again found that these were "**required to [be expended] in order [for B&R] to remain in business**." (*Id.* (emphasis added).) Specifically, the EHB found that B&R "was involved in a number of legal disputes with royalty holders and lease owners" and did not have "much choice but to legally **defend** its interests and that it was reasonable for it to hire legal counsel to assist it in doing so." (*Id.* at 16 (emphasis added).) However, Campola's testimony reflects that only **some** of the legal fees appear to have been related to maintaining producing

26

wells or from litigation **against** B&R that sought to terminate the lease of a producing well and have B&R plug the well, remove all of the pipeline, regrade and replant grass and trees, which Campola indicated would cost "close to a hundred thousand dollars," money damages, and potentially prevent access to four producing wells. (R.R. at 54a-59a, 64a-65a, 78a-79a, 83a-84a, 101a-03a, 124a-25a, 210a, 1008a-10a; 2017 Adjudication FOF ¶¶ 26, 28-29.) To the extent that Campola's testimony reflects the payment of legal fees for these reasons, it constitutes substantial evidence that supports the EHB's finding. But Campola also testified that legal fees were expended by B&R to commence litigation **against landowners** seeking to obtain access to **additional wells** to bring those wells online or other business purposes, like purchasing the Q3 line. (R.R. at 81a-84a, 1008a-10a, 1020a-21a, 3368a; 2017 Adjudication FOF ¶¶ 26, 28-29.) Beaufait's testimony did not consider whether any of the legal fees had to be paid to ensure B&R's continued operation. (R.R. at 1099a-1100a, 1115a-16a.) Rather, Beaufait testified that they were reasonable expenses because they were "helpful" and "ordinary, normal expenses" in the industry. (*Id.* at 1117a-19a.) Accordingly, the evidence does **not** support the EHB's findings that **all** the legal expenses were "**required to [be expended] in order [for B&R] to remain in business**," (2020 Adjudication at 15 (emphasis added).)

Campola's testimony regarding the expenditure of funds on legal fees to protect B&R's legal rights in **existing producing wells**, thereby allowing it to continue to bring in revenue, and to defend B&R from default judgment that could cost $100,000 and loss of access to producing wells constitutes substantial evidence that those expenditures were required for B&R "to remain in business," (*id.*), thereby allowing it to make money to perform its statutory obligation to plug the Wells.

27

Thus, those amounts should not be added back into B&R's finances. However, the same cannot be said for Campola's causing B&R to expend fees to **expand** B&R's business interests, **rather than on remedying the known, ongoing statutory violations**, by commencing litigation against landowners to bring wells online or inquiring about purchasing a gas line. There was no evidence to support the finding that these expenditures were required for B&R to remain in business and, therefore, Campola did not cause B&R to make reasonable efforts to plug the Wells when he directed the expenditure of these funds elsewhere. Because the EHB found that **all** of the legal fees should be excluded, it is necessary to remand this matter to the EHB to calculate the legal fees that were expended to protect B&R's legal rights in existing producing wells and to defend B&R from default judgment and exclude **only** those amounts from B&R's financial ability to plug the Wells. The remaining legal fees shall be added back into B&R's finances and used to calculate how many more Wells B&R could have plugged.

As for the catch-all expenses, the EHB found that they were "**required to [be expended] in order [for B&R] to remain in business**." (*Id.* (emphasis added).) Unlike Campola's detailed testimony regarding the necessity of the pumper and line repair fees to B&R's continued ability to operate, his testimony about these general business expenses simply described what the expenses were and that they were "business-related." (R.R. at 1010a-13a.) Even Campola's expert, Beaufait, testified that his review did **not** consider whether the expenditures were "indispensable" to B&R's continued operation, only whether they were "ordinary" or "normal" in the industry or "helpful." (*Id.* at 1115a-16a, 1118a, 1120a, 1123a-24a.) This testimony does not support the EHB's findings that these expenses were "**required to [be expended] in order [for B&R] to remain in business**," (2020 Adjudication at 15

28

(emphasis added).) The EHB further chose not to include the catch-all category because it "involved generally small amounts." (*Id*. at 16.) However, small amounts add up. Indeed, the $36,273 spent on the catch-all expenses could have been used to plug one of the Wells, and, with $727 more, a second Well. As the EHB's findings are not supported by substantial evidence, Campola did not use reasonable efforts when causing B&R to expend funds for purposes that were not required for B&R to remain in business while ignoring B&R's statutory obligation to remedy its violations of the 2012 Oil and Gas Act.

### 3. B&R's Ability to Borrow Money

Finally, DEP asserts the EHB erred in not considering B&R's proven ability to borrow funds as reasonable efforts that Campola could have caused B&R to use to remedy the violations rather than pay for Campola's own legal defense in this matter. Respondents do not dispute that Campola directed B&R to borrow funds to defend Campola from personal liability for the violations but argue that this decision was reasonable and necessary and should not be considered in analyzing B&R's financial resources.

The EHB was tasked on remand to determine "how many, if any, of the Wells could have been plugged if Campola had caused B&R to make" reasonable efforts "to plug the Wells." *B&R I*, 180 A.3d at 822. Although the EHB addressed loans from B&R to Campola, finding that those amounts should be added back into B&R's financial resources, it did not consider B&R's ability to borrow more than $210,000 from Campola for this litigation to determine whether those efforts should have been used to remedy the violations. (2020 Adjudication at 17; R.R. at 1466a-85a, 3318a-44a.) Rather, the EHB found that these transactions were "standard business loans"

and, therefore, did not consider their impact on B&R's financial ability. (2020 Adjudication at 17 & n.9.)

Campola may have reasonably directed B&R to borrow money to defend both B&R and, by extension, Campola against the violations initially, because those loans would be necessary for protecting B&R from liability and allowing B&R to remain in business. However, the parties stipulated in November 2016 that B&R was **required** to plug the Wells under the 2012 Oil and Gas Act and had not done so. B&R did not pursue its appeal, resulting in its dismissal. (2017 Adjudication at 11-12); *B&R I*, 180 A.3d at 815-16. At that time, **B&R's liability** was no longer contested. Rather, the **only** disputed issue became **Campola's personal liability**. Since then, Campola has caused B&R to borrow more than **$210,000 from Campola**, and have **B&R <u>pledge its assets to Campola</u>** as collateral, to defend **<u>Campola alone</u>**. Respondents claim that B&R had a duty to defend Campola, and Campola testified that the loans made business sense because B&R could deduct the legal expenses. (R.R. at 1045a.) Campola's testimony does not support the EHB's determinations that these loans were "standard business loans" that **were necessary for B&R remaining in business**. (2020 Adjudication at 15, 17 & n.9.) Moreover, had Campola directed B&R to use this proven borrowing power to **remedy** the violations, which would be necessary for B&R to come into compliance with the 2012 Oil and Gas Act, avoid liability (even if only partially), and remain in business, it would have been difficult for DEP to have established Campola's wrongful conduct, similar to *Kaites*, or that Campola had not caused B&R to make reasonable efforts to plug the Wells. In short, it appears that Campola was willing to direct B&R to borrow money and pledge its assets **when it was necessary to protect Campola personally** but not when it was necessary for B&R to satisfy its **legal**

**obligation to remedy** its statutory violations by plugging the Wells. While these loans were from Campola to B&R and were supported by documentation, unlike the payments from B&R to Campola that the EHB added back into B&R's finances, these loans, like those payments, were for **Campola's personal benefit**. Accordingly, it was error for the loans made after B&R's liability was no longer at issue not to have been included in B&R's financial ability to plug the Wells under the reasonable efforts standard, and we remand for the EHB to recalculate how many more Wells B&R could have plugged had these amounts been put to that purpose.[13]

## III. Conclusion

In sum, the EHB concluded, **without factual support in the record**, that the expenses and loans it was excluding from its consideration were, respectively, "**required to [be expended] in order [for B&R] to remain in business**," or were simply "standard business loans." (2020 Adjudication at 15, 17 & n.9 (emphasis added).) That the record lacks evidence to support all of these exclusions speaks to whether the EHB erred as a matter of law in applying the reasonable efforts standard to determine how many Wells, if any, for which Campola could be personally liable under the participation theory. Although the EHB disagreed with Campola that "B&R['s] plugging obligation [w]as a[n] . . . afterthought to [B&R's] other business requirements" as being "inconsistent with the law in Pennsylvania," (*id.* at 11), the EHB nonetheless deferred to Campola's prioritization of B&R's "other business requirements" without requiring substantial evidence that would support such

---

[13] DEP also argues that the EHB's calculation of B & R's financial resources as excluding the $28,000 B & R received from Select Energy is not supported by substantial evidence. Respondents contend the EHB properly rejected DEP's Select Energy arguments, as there was no financial impact as a result of that transaction. The record reveals that B & R received money from Select Energy and repaid those amounts to Select Energy, (R.R. at 913a-14a, 952a-53a, 1066a, 1082a-83a), confirming, as the EHB held in its reconsideration decision, that the transaction had no financial impact.

deference. It similarly deferred to Campola's prioritization of B&R's ability to borrow substantial amounts in order to defend Campola personally, rather than for remedying B&R's statutory obligations, without requiring evidence that showed such prioritization was "**required . . . in order [for B&R] to remain in business**," (*id.* at 15 (emphasis added)), which would have supported the EHB's finding that such loans were "standard business loans" that should have been excluded. Such deference, in the absence of supporting substantial evidence, to the business judgment of a private individual running a private business to the detriment of the environmental health of the Commonwealth guts the participation theory of liability, particularly where, as here, that private individual makes it clear that the individual **had no intention of spending funds** to make the private business comply with its known environmental obligations. In granting such deference, the EHB essentially treated the continuation of the unlawful conduct as a reasonable effort thereby allowing Campola to avoid liability based on the unlawful acts themselves. Ultimately, a business's obligation to comply with environmental laws to prevent future harm may not be evaded or avoided even where that business is in financial trouble, *Penn Terra Ltd.*, 733 F.2d at 277-78; *In re Jager*, 609 B.R. at 161, an obligation that Campola disregarded in his direction of B&R's business.

Accordingly, in applying the reasonable efforts standard set forth in *B&R I*, the EHB erred in not adding back into B&R's finances the funds that Campola used to pay the catch-all costs, which the record did not support were necessary to maintain and service B&R's currently producing wells, the legal fees that were not necessary to protect B&R's legal rights in currently producing wells or to defend B&R against litigation, or amounts borrowed by B&R that were not necessary to defend B&R but were used to defend Campola personally. Because the amount of

32

B&R's legal expenses must be calculated in light of our conclusion, we must remand the matter for the EHB to do so. Once those calculations are made, they, along with amount in loans Campola caused B&R to take to defend Campola alone, should be added into B&R's financial resources and used to calculate how many additional Wells could have been plugged had Campola directed their use to remedy the violations of the 2012 Oil and Gas Law.

Although DEP asks the Court not to remand but to make these calculations itself, and while this Court would prefer not to delay these proceedings, it is well settled that the EHB, not this Court, is the fact finder. *B&R I*, 180 A.3d at 817 n.2. Therefore, the calculations necessary to redetermine B&R's financial ability to plug the Wells, and Campola's personal liability are for the EHB to perform in its role as fact finder, a role this Court will not usurp. Accordingly, we vacate the EHB's Order and regretfully remand for the EHB to make these new calculations to ascertain how many more Wells could have been plugged and to determine Campola's personal liability, in accordance with our opinion.[14]

 

 

_____

**RENÉE COHN JUBELIRER,** Judge

---

[14] Based on our disposition on this basis, we do not address DEP's Environmental Rights Amendment arguments, *Wertz v. Chapman Township*, 741 A.2d 1272, 1274 (Pa. 1999) ("It is axiomatic that if an issue can be resolved on a non-constitutional basis, that is the more jurisprudentially sound path to follow."), except to hold that DEP did not waive those arguments as Respondents assert. A review of the record reveals that DEP raised the applicability of the Environmental Rights Amendment in its briefs on remand. (R.R. at 469a, 599a, 662a-63a, 3405a.) Further, it was not until the 2020 Adjudication that the EHB utilized the legitimate business expense standard to determine Campola's personal liability. Therefore, DEP could not have raised this issue before that decision and, as such, we will not find the issue waived.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Department of Environmental :
Protection, :
     Petitioner :
      :
    v. : No. 291 C.D. 2020
      :
B&R Resources, LLC and :
Richard F. Campola, :
     Respondents :

## O R D E R

**NOW**, December 6, 2021, the Order of the Environmental Hearing Board, entered in the above-captioned matter, is **VACATED**. This matter is **REMANDED** in accordance with the foregoing opinion.

Jurisdiction relinquished.

---

**RENÉE COHN JUBELIRER,** Judge